[No. 6796–3–III.   Division Three.   April 29, 1986.]

EDWARD L. GATES, ET AL, *Appellants*, v. STANDARD BRANDS INCORPORATED, *Respondent*.

*Guy Nelson* and *Hormel, Aiken & Nelson,* for appellants.

*David E. Sonn, Donald L. Dimmitt,* and *Jeffers, Danielson, Sonn & Aylward, P.S.,* for respondent.

MUNSON, J.—Edward L. Gates bit into a Baby Ruth candy bar, manufactured by Standard Brands, which contained a "snake bone." Mr. Gates subsequently brought this action, alleging breach of the implied warranty of fitness for human consumption. By special verdict, the jury found the candy bar was not "unreasonably dangerous." Mr. Gates appeals, claiming the trial court erred in: (1) ruling a cause of action for breach of the implied warranty of fitness for human consumption ceased to exist following the adoption of the Restatement (Second) of Torts § 402A (1965); (2) not finding as a matter of law the candy bar was "defective" according to section 402A; and (3) admitting testimony concerning Standard Brands' manufacturing process of candy bars.

Mr. Gates purchased a Baby Ruth candy bar.[1] Eating it, he bit into something which he alleged was "gristly" or "spongy"; he testified he immediately noticed a nauseating taste; he became sick and began to vomit. Mr. Gates handed his wife the remaining piece of candy bar and the object, which was later identified as a snake vertebra.

---

[1] Because Mr. Gates consumed the candy bar and thus sustained the alleged harm on February 9, 1980, the products liability act, RCW 7.72, is inapplicable. *See* RCW 4.22.920 (act applied to claims arising on or after July 26, 1981).

Standard Brands' expert witness, an archaeologist at Central Washington University, testified the vertebra was several hundred to several thousand years old; was odorless and tasteless; and consisted of approximately 97 percent inorganic material. A quality control expert, called by Standard Brands, testified a Baby Ruth could not contain any matter which was either foul smelling or tasting because of the manufacturing process.

The court phrased its instructions in the terminology of the Restatement (Second) of Torts § 402A (1965), which required the jury to find, among other things, the candy bar was unreasonably dangerous. Mr. Gates excepted to these instructions because they did not express his theory of implied warranty of fitness for human consumption.

Mr. Gates contends the court's instructions improperly imposed the burden of proving the candy bar was "unreasonably dangerous" and, therefore, defective as defined by section 402A. Thus instructions 5 and 6[2] erroneously prohibited him from presenting his breach of implied warranty theory. He maintains the court erred in rejecting his proposed instructions and ruling the implied warranty of fitness for human consumption no longer exists as a separate theory after the adoption of section 402A in *Ulmer v. Ford*

---

[2]Instruction 5 provided:

"The plaintiffs have the burden of proving each of the following propositions:

"First, that the defendant supplied a product which was unreasonably dangerous at the time the product left the defendant's control;

"Second, that the plaintiff, Edward L. Gates, was injured; and

"Third, that the unreasonably dangerous condition of the product was a proximate cause of the plaintiff's injury.

"If you find from your consideration of all the evidence that each of these propositions has been proved, your verdict should be for the plaintiffs. On the other hand if any of these propositions has not been proved, your verdict should be for the defendant."

Instruction 6 provided:

"A product is considered 'unreasonably dangerous' if it is dangerous in a way or to an extent beyond that which an ordinary user would reasonably contemplate when using it in a foreseeable manner. In determining whether a product is unreasonably dangerous, you should consider such factors as the nature of the product and the claimed defect indicate are appropriate."

*Motor Co.,* 75 Wn.2d 522, 452 P.2d 729 (1969).

Washington first recognized a cause of action for breach of the implied warranty of fitness for human consumption over 70 years ago. *Mazetti v. Armour & Co.,* 75 Wash. 622, 135 P. 633 (1913). The action was premised on the theory the law implies a special warranty that food sold is wholesome and fit for human consumption. *Pulley v. Pacific Coca–Cola Bottling Co.,* 68 Wn.2d 778, 783, 415 P.2d 636 (1966); *Nelson v. West Coast Dairy Co.,* 5 Wn.2d 284, 289–90, 105 P.2d 76, 130 A.L.R. 606 (1940); *Flessher v. Carstens Packing Co.,* 93 Wash. 48, 52, 160 P. 14 (1916); *Mazetti,* at 624–25. As stated in *Pulley,* at 783:

> [M]anufacturers and retailers of food products have a duty to consumers, *i.e.,* the general public, to provide adequate protection from the harmful effects *of foreign* objects. *Connell v. Norton Coca–Cola Bottling Co.,* 187 Kan. 393, 357 P.2d 804 (1960); *LaHue v. Coca Cola Bottling, Inc.,* 50 Wn.2d 645, 314 P.2d 421 (1957).

(Italics ours.)

Although the standard of liability was analogous to the standard embodied in the common law of implied contractual warranties,[3] the theory of *Mazetti* and its progeny arose by implication of law and principles of tort. *Ulmer,* at 525; *LaHue v. Coca Cola Bottling, Inc.,* 50 Wn.2d 645, 647, 314 P.2d 421 (1957); *Mazetti,* at 625.

This theory of implied warranty was gradually extended to nonfood cases.[4] Recovery was allowed on the rationale

---

[3]*See generally* W. Prosser, *Torts* § 97 (4th ed. 1971). The common law of implied warranties was codified in the provisions of the Uniform Sales Act which Washington adopted in 1925. Laws of 1925, 1st Ex. Sess., ch. 142, § 15, p. 361 (RCW 63.04.160). The Uniform Sales Act was repealed by the Legislature, effective June 30, 1967, at which time the provisions of the Uniform Commercial Code took effect (RCW Title 62A). The analogous section to former RCW 63.04.160 under the Uniform Commercial Code is RCW 62A.2–314(2) (Laws of 1965, 1st Ex. Sess., ch. 157, § 2–314, p. 2362) which provides in pertinent part: "Goods to be merchantable must be at least such as . . . (c) are fit for the ordinary purposes for which such goods are used; . . ." RCW 62A.2–314(2)(c).

[4]*See, e.g., Brown v. General Motors Corp.,* 67 Wn.2d 278, 407 P.2d 461 (1965) (foreign object in power vacuum unit causing brakes to lock submitted to jury on

that no logical distinction could be drawn between those particular products and food. *See generally* Comment, *Defective Products Liability—Tort or Implied Warranty,* 1 Gonz. L. Rev. 106 (1966). Finally, in *Ulmer* the court adopted a theory of strict liability as defined by the Restatement (Second) of Torts § 402A,[5] providing:

> Section 402A, . . . is in accord with the import of our cases which have been decided upon a theory of breach of implied warranty and we hereby adopt it as the law of this jurisdiction. . . . Consequently, *our decision to discard the terminology of "implied warranty"* and adopt the language of strict liability contained in the Restatement (Second) of Torts § 402A, applies only to the liability of manufacturers.

(Italics ours.) *Ulmer,* at 531–32. The court explained it was discarding the label of "implied warranty" because:

> *[I]t is illogical to create an implied warranty but refuse*

---

theory of implied warranty); *Brewer v. Oriard Powder Co.,* 66 Wn.2d 187, 401 P.2d 844 (1965) (dynamite); *Esborg v. Bailey Drug Co.,* 61 Wn.2d 347, 378 P.2d 298 (1963) (hair tint); *Martin v. J.C. Penney Co.,* 50 Wn.2d 560, 313 P.2d 689, 80 A.L.R.2d 697 (1957) (clothing); *Ringstad v. I. Magnin & Co.,* 39 Wn.2d 923, 239 P.2d 848 (1952) (clothing); *Baxter v. Ford Motor Co.,* 168 Wash. 456, 12 P.2d 409, 88 A.L.R. 521 (1932) (auto windshield). The history of this gradual extension of the implied warranty in tort theory from food to nonfood products is exhaustively detailed in the seminal articles by Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer),* 69 Yale L.J. 1099 (1960) and *The Fall of the Citadel (Strict Liability to the Consumer),* 50 Minn. L. Rev. 791 (1966). *See also* Titus, *Restatement (Second) of Torts Section 402A and the Uniform Commercial Code,* 22 Stan. L. Rev. 713 (1970); Restatement (Second) of Torts § 402A, comment *c* (1965).

[5] Restatement (Second) of Torts § 402A provides:

"(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

"(a) the seller is engaged in the business of selling such a product, and

"(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

"(2) The rule stated in Subsection (1) applies although

"(a) the seller has exercised all possible care in the preparation and sale of his product, and

"(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller."

*to attach to it any of the customary incidents of a warranty.* For examples, in this court–created warranty, there is no necessity of a contract or privity between the parties; no necessity that the purchaser rely on the warranty; no requirement of notice of the breach within a reasonable time after learning of it; and no provision for disclaimer. *There is also the difficulty of reconciling the implied warranty with the Uniform Sales Act, which provides that there shall be no implied warranties other than those listed therein.* (*See* RCW 63.04.160).

(Italics ours.) *Ulmer,* at 529.

Notwithstanding *Ulmer,* Mr. Gates vigorously asserts that a separate cause of action for breach of the implied warranty of fitness for human consumption still exists in Washington. He contends (1) strict products liability, as defined by section 402A and adopted by *Ulmer,* embodies a different standard of liability, and (2) according to the *Mazetti* line of cases, he need only prove the candy bar was "unfit for human consumption" as opposed to "unreasonably dangerous". He concludes food may be "unfit" or "impure" without being "unreasonably dangerous" and, therefore, the court's instructions, based on section 402A, erroneously imposed on him the heavier burden of showing the candy bar was "unreasonably dangerous."

■■ However, comparison of the two causes of action demonstrates that they are essentially the same:

(1) Under 402A, the defendant must be engaged as a manufacturer or seller of the product which caused the injury. Restatement (Second) of Torts § 402A(1)(a) (1965). Similarly, in *Geisness v. Scow Bay Packing Co.,* 16 Wn.2d 1, 13–14, 132 P.2d 740 (1942), the court required the same element.

(2) Under both theories, the unwholesome or defective condition must exist at the time it leaves the manufacturer's hands. *Compare* Restatement (Second) of Torts § 402A, comment *g* (1965) *with Geisness,* at 14.

(3) Neither the implied warranty in tort theory nor section 402A is subject to the various contractual doctrines such as privity, notice, or disclaimer; neither the-

ory requires that the plaintiff prove the defendant was negligent. *Compare Ulmer v. Ford Motor Co., supra, with Flessher v. Carstens Packing Co., supra;*[6] and

(4) Finally, the crucial question is whether the standards "unfit for human consumption" and "defective condition unreasonably dangerous to the user" provide the same degree of liability with respect to the sale of food.

The standard of liability provided for in section 402A is the same as that found in implied warranty. As is true in several areas of the law, the term "unreasonably dangerous" cannot be taken literally. The meaning of that phrase has spawned many conceptual problems, but *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 152–55, 542 P.2d 774 (1975) eliminated much of the confusion. In *Tabert,* at 154, the court rejected the literal interpretation of unreasonably dangerous, and firmly established that the concept of defect in Washington, as refined by comment *i* to section 402A, is based on the "consumer's reasonable expectation of buying a product which is reasonably safe." Accordingly, the court held a product is defective when it is "not reasonably safe," which simply means: "it [the product] must be unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer." *Tabert,* at 154. *See also*

---

[6]Comment *m* to section 402A provides, in part:

"*'Warranty.'* . . .

"A number of courts, seeking a theoretical basis for the liability, have resorted to a 'warranty,' either running with the goods sold, by analogy to covenants running with the land, or made directly to the consumer without contract. . . . But if this is done, it should be recognized and understood that the 'warranty' is a very different kind of warranty from those usually found in the sale of goods, and that it is not subject to the various contract rules which have grown up to surround such sales.

". . . The rule stated in this Section is not governed by the provisions of the Uniform Sales Act, or those of the Uniform Commercial Code, as to warranties; and it is not affected by limitations on the scope and content of warranties, or by limitation to 'buyer' and 'seller' in those statutes. Nor is the consumer required to give notice to the seller of his injury within a reasonable time after it occurs, as is provided by the Uniform Act. . . . In short, 'warranty' must be given a new and different meaning if it is used in connection with this Section. It is much simpler to regard the liability here stated as merely one of strict liability in tort."

section 402A, comments *g, h,* and *i.* Thus, under Washington's formulation of section 402A, a product is defective, notwithstanding the phrase "unreasonably dangerous," when it is "not reasonably safe . . . to an extent beyond that . . . reasonably contemplated by the ordinary consumer."

We believe the concept of consumer expectations as set out in section 402A and formulated in *Ulmer* and *Tabert* reflects the same warranty heritage found in the theory of implied warranty in tort. Thus, we conclude the *concepts* represented by the labels "defective condition unreasonably dangerous" and "unfitness" are identical.[7] Consequently, we hold a cause of action for breach of an implied warranty of fitness for human consumption has been succeeded[8] by the "buyer oriented" consumer expectations test when determining whether food is defective.[9] *See Lenhardt v.*

---

[7]*See* Fischer, *Products Liability—The Meaning of Defect,* 39 Mo. L. Rev. 339, 348–49 (1974); Note, *Products Liability—Strict Liability in Tort: Defect Need Not Render Product "Unreasonably Dangerous,"* 49 Wash. L. Rev. 231, 250–51 (1973). *See also Foster v. Ford Motor Co.,* 621 F.2d 715, 719 (5th Cir. 1980); *Chestnut v. Ford Motor Co.,* 445 F.2d 967, 969 n.2 (4th Cir. 1971); *Basko v. Sterling Drug, Inc.,* 416 F.2d 417, 427 (2d Cir. 1969); *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121, 126 (9th Cir. 1968).

[8]*Accord, Chance v. Richards Mfg. Co.,* 499 F. Supp. 102, 104 (E.D. Wash. 1980) ("The concept of a common law implied warranty action without privity as it was known prior to *Ulmer,* no longer exists."); *cf. Temple v. Wean United, Inc.,* 50 Ohio St. 2d 317, 322, 364 N.E.2d 267, 271 (1977) ("Because there are virtually no distinctions between Ohio's 'implied warranty in tort' theory and the Restatement version of strict liability in tort, . . . we hereby approve Section 402 A of the Restatement of Torts 2d." (Footnote omitted.)).

[9]This result comports with the provisions of section 402A, the reasoning manifested in *Ulmer* and *Tabert,* the rationales underlying section 402A, and the trend of other food decisions in Washington. *See, e.g., Jeffries v. Clark's Restaurant Enters.,* 20 Wn. App. 428, 580 P.2d 1103 (1978). In addition, the historical development of 402A supports our decision. Dean Wade states: "As initially prepared by the Reporter, Dean Prosser, and as unanimously approved by the Advisors, the section applied only to foodstuffs . . ." Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 830 (1973) (citing Restatement (Second) of Torts § 402A (Prelim. Draft No. 6, 1958)). This result is also compatible with the subsequently adopted Washington tort reform act of 1981 (Laws of 1981, ch. 27). RCW 7.72.030, concerning manufacturing defects, provides in part:

*Ford Motor Co.,* 102 Wn.2d 208, 211–12, 683 P.2d 1097 (1984).

Mr. Gates next contends the court erred in refusing to hold a candy bar containing a snake vertebra is defective as a matter of law. Generally, whether a product is defective is a jury question. *See Lenhardt,* at 212; *Estate of Ryder v. Kelly–Springfield Tire Co.,* 91 Wn.2d 111, 119, 587 P.2d 160, 16 A.L.R.4th 129 (1978). Here, the court instructed the jury a product is defective if "unreasonably dangerous." Although the court correctly left the question of defectiveness to the jury, we conclude the instructions erroneously defined defect under Washington's formulation of section 402A.

The concept of defect, under our view of 402A, is the same as the standard embodied in *Mazetti* and its progeny. Unfortunately, the drafters of the Restatement modified the definition of defect with the phrase "unreasonably dangerous." This addition was not supposed to change the *concept* of defect as defined by comment *i* to section 402A;[10] the practical effect, however, has been to create sig-

---

    (2) A product manufacturer is subject to strict liability to a claimant if the claimant's harm was proximately caused by the fact that the product was *not reasonably safe* in construction . . .

    (a) A product is *not reasonably safe* in construction if, when the product left the control of the manufacturer, the product deviated in some material way from the design specifications or performance standards of the manufacturer, or deviated in some material way from otherwise identical units of the same product line.

(Italics ours.)

[10]As originally written for the American Law Institute, section 402A merely required that food be "in a condition dangerous to the consumer." Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 830 (1973). The section was changed in 1960 to read in its present form; Wade, at 830, explains the change occurred because:

    [T]he Council was worried about liability for a product like whiskey, so that a "man who consumes it and gets delirium tremens" might recover because a jury "might find that all whiskey is unreasonably dangerous to the consumer." The word "defective" was added to ensure that it was understood that something had to be wrong with the product.

Comment *i* to section 402A provides:

    *Unreasonably dangerous.* . . . Ordinary sugar is a deadly poison to dia-

nificant definitional problems with respect to the term.

In Washington, a product which is unreasonably dangerous is necessarily defective. *Bernal v. American Honda Motor Co.*, 87 Wn.2d 406, 411, 553 P.2d 107 (1976). However, a product *need not* be unreasonably dangerous in order to be found defective. This is because: "unreasonably dangerous implies a *higher and different standard* than what we conceive to be the intended thrust of section 402A strict liability." (Italics ours.) *Tabert*, at 154. Rather, as noted, a product is defective when it is "not reasonably safe" because of a condition which renders the product unexpectedly unsafe to the ordinary consumer. *See, e.g., Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 616–17, 707 P.2d 685 (1985); *Tiderman v. Fleetwood Homes*, 102 Wn.2d 334, 340, 684 P.2d 1302 (1984); *Lenhardt*, at 211; *Connor v. Skagit Corp.*, 99 Wn.2d 709, 714, 664 P.2d 1208 (1983); *Little v. PPG Indus., Inc.*, 92 Wn.2d 118, 122, 594 P.2d 911 (1979); *Teagle v. Fischer & Porter Co.*, 89 Wn.2d 149, 154–55, 570 P.2d 438 (1977).

The difference between "not reasonably safe" and "unreasonably dangerous" is not merely a theoretical problem or simply a question of semantics. The application of one term or the other has a dramatic impact on how the issue of defect is perceived by a jury. The minimum threshold, at which point a product may be found defective, is raised or lowered depending on which phrase is chosen.

█ Following the lead of *Tabert* and subsequent deci-

---

betics, and castor oil found use under Mussolini as an instrument of torture. *That is not what is meant by 'unreasonably dangerous' in this Section.* The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. . . . Good tobacco is not unreasonably dangerous merely because the effects of smoking may be harmful; but tobacco containing something like marijuana may be unreasonably dangerous. Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.

(Italics ours.)

sions, we find the court erred by including "unreasonably dangerous" in its jury instructions rather than "not reasonably safe." Instructing a jury that a product is defective, if unreasonably dangerous, connotes to the jury that the product's deviation or flaw must create a condition of abnormal or extraordinary danger before recovery is allowed.[11] Such a connotation unavoidably places upon the plaintiff a significantly increased burden of proof which does not comport with our view of Washington's products liability doctrine. It also undermines one of the fundamental rationales for adopting strict products liability; *i.e.*, the elimination of the heavy proof problems which the plaintiff must bear under other theories.

We recognize instruction 6 also included consumer expectation language which mitigates, to some extent, the implication of extraordinary danger embodied in the phrase unreasonably dangerous. Notwithstanding, because the jury may have interpreted instructions 5 and 6 as requiring Mr. Gates to prove the candy bar was extraordinarily dangerous, rather than simply "not reasonably safe," we cannot say the error was harmless given the facts of this case. Therefore, we conclude the instructions, as given, were misleading and failed to inform the jury of the proper standard of liability under our formulation of section 402A.

---

[11]*See* W. Keeton, D. Owen & J. Montgomery, *Products Liability and Safety: Cases and Materials* 199 (1980); Wade, *On the Nature of Strict Tort Liability for Products,* 44 Miss. L.J. 825, 832–33 (1973) (providing that other terms such as "not reasonably safe" or "not duly safe" are more appropriate); Note, *Products Liability—Strict Liability in Tort: Defect Need Not Render Product "Unreasonably Dangerous",* 49 Wash. L. Rev. 231 (1973); *Hansen v. Cessna Aircraft Co.,* 578 F.2d 679, 684 (7th Cir. 1978) (citing Twerski, *From Defect to Cause to Comparative Fault—Rethinking Some Product Liability Concepts,* 60 Marq. L. Rev. 297, 324–25 (1977)). *See also Cronin v. J.B.E. Olson Corp.,* 8 Cal. 3d 121, 501 P.2d 1153, 104 Cal. Rptr. 433 (1972); *Barker v. Lull Eng'g Co.,* 20 Cal. 3d 413, 573 P.2d 443, 458, 143 Cal. Rptr. 225 (1978).

*See Brown v. Spokane Cy. Fire Protec. Dist. 1,* 100 Wn.2d 188, 194, 668 P.2d 571 (1983). Upon new trial, a defective product should be defined, for the purposes of the instructions, as a product which is "not reasonably safe" because "it [is] unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer." *Tabert,* at 154. Although we reverse for a new trial, we address Mr. Gates' final assignment of error since the question may arise again at the subsequent trial.

Mr. Gates' final contention is that the trial court erred in admitting the testimony of Harry Lawrence. Apparently, the theory of both parties was that the vertebra arrived with the peanuts. Mr. Lawrence's testimony related the manufacturing process employed by Standard Brands with respect to the processing of the peanuts used in the candy bars. He indicated that by the time Mr. Gates bit into the Baby Ruth, the vertebra could not have been "gristly or spongy" and could not have been tasted or smelled. Mr. Gates maintains, based on *Pulley v. Pacific Coca–Cola Bottling Co.,* 68 Wn.2d 778, 783, 415 P.2d 636 (1966), that the introduction of this evidence was irrelevant and prejudicial.

In *Pulley,* at 783, the defendant tried to rebut the plaintiff's contention that a bottle of Coca–Cola contained the remains of a cigarette by attempting to introduce evidence which demonstrated the modern bottling methods utilized to prevent contamination.

Here, on the other hand, the testimony of Mr. Lawrence was not offered to demonstrate the Baby Ruth did not contain the snake vertebra at the time it left the seller. Rather, the testimony was offered to show the condition of the vertebra at the time Mr. Gates bit into the candy bar. The court's jury instructions stated the testimony of Mr. Lawrence could only be considered for the limited purpose of the vertebra condition. Therefore, we find no error.

We reverse and remand for a new trial consistent with this opinion.

GREEN, C.J., and MCINTURFF, J., concur.

Reconsideration denied June 19, 1986.

Review denied by Supreme Court September 2, 1986.