[Nos. 51844-1, 52607-9. En Banc. November 6, 1986.]

BRADLEY LESTER BAUGHN, *Appellant,* v. HONDA MOTOR COMPANY, LTD., ET AL, *Respondents.*

DOUGLAS BRATZ, *Appellant,* v. HONDA MOTOR COMPANY, LTD., ET AL, *Respondents.*

128

*Manza, Moceri, Gustafson & Messina, P.S.,* by *Michael S. Manza, John S. Glassman, John L. Messina, Edward L. Colleran,* and *Stephen L. Bulzomi,* for appellant Baughn.

*Anderson, Caraher, Brown & Burns,* by *James M. Caraher,* for appellant Bratz.

*Pinckney M. Rohrback, Thomas A. Heller,* and *Keller Rohrback,* for respondents.

*Bryan P. Harnetiaux* and *Robert H. Whaley* on behalf of Washington Trial Lawyers Association, amici curiae for appellants.

*William H. Robertson* and *Frankie A. Crain* on behalf of Washington Association of Defense Counsel, amici curiae for respondents.

ANDERSEN, J.—

THIS CASE IN SUMMARY

Two children, each 2 months shy of his ninth birthday, were seriously injured while riding a Honda mini–trail bike on a public roadway. They drove through three stop signs without stopping before colliding with a truck which they did not see due to their looking at two other children playfully chasing them on another mini–trail bike. Parents of

the two injured children were motorcyclists who had purchased mini–trail bikes for their children and had instructed the children never to use them on public streets and roads. The mini–trail bike in question had a prominent warning label on it, immediately in front of the operator, stating:

READ OWNER'S MANUAL CAREFULLY

THIS VEHICLE WAS MANUFACTURED FOR OFF–THE–ROAD USE ONLY. DO NOT OPERATE ON PUBLIC STREETS, ROADS OR HIGHWAYS.

The owner's manual contained similar explicit instructions against driving on public streets and roads. In the trial court and on appeal, able counsel for the children injured in this tragic accident vigorously argued every seemingly conceivable ground of recovery. Their principal thrust on appeal, however, was to urge this court to adopt a rule which, in practical effect, would hold the manufacturer of mini–trail bikes absolutely liable for injuries sustained by users thereof. We have carefully considered this latter argument but decline to so hold; instead, we adhere to the established principles of strict liability as enunciated by this court in *Seattle–First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 542 P.2d 774 (1975) and subsequent cases applying the strict liability doctrine. If mini–trail bikes are to be declared illegal in this state, the Legislature, which can hold public hearings and consider all viewpoints and aspects of the matter, is the appropriate body to so decide. For the reasons more particularly set forth hereinafter, we affirm the trial court's summary judgment of dismissal.

## FACTS OF CASE

On August 14, 1972, Douglas Bratz and Bradley Lester Baughn were injured while riding a Honda Z50AK3 mini–trail bike. Douglas, whose birthdate is October 21, 1963, was driving the mini–trail bike on a public road in Pierce County. Bradley, born October 15, 1963, was riding behind Douglas as a passenger. The boys were being chased by Donna Tillman and Rory Baughn on Donna's minibike.

Douglas drove through three stop signs without stopping before colliding with a truck. Just before the collision, Douglas was looking at Donna instead of the road ahead of him. Bradley was not wearing a helmet; Douglas apparently wore one that flew off on impact because it was unfastened.

The mini–trail bike had been purchased a few days before the accident by Vernon Bratz for his three children. Bratz had bought his children another minibike in 1969, which all three of them rode. Bratz bought two motorcycles for himself in 1967. He told his children several times not to ride either minibike in the street. Before the accident occurred, Douglas and Bradley were riding the Honda in the street outside the Bratz home. Douglas' mother, June, knew where they were but did nothing to stop them.

Bradley Baughn's father Jack bought two minibikes for his children before the accident, and had his own motorcycle as well. He had instructed his children that the two minibikes were not meant for road use. Two weeks before the accident, he had punished Bradley for riding his minibike in the street. He spanked him and took the bike away. He had also told his children not to ride on the Bratz bikes as passengers because they could get hurt.

The mini–trail bike contained its own instructions regarding road use. A decal on the mini–trail bike stated that the bike was manufactured for off–the–road use only, and added "Always Wear a Helmet". The first page of the owner's manual stated in bold print that the bike was for off–the–road use only.

On September 7, 1976, more than 4 years after the accident, Jack Baughn was appointed guardian ad litem for Bradley and filed suit against June Bratz in Pierce County Superior Court. The suit was settled and dismissed on February 8, 1978. On September 19, 1978, Jack Baughn was appointed Bradley's general guardian. On November 17, 1982, he filed an amended complaint in federal district court against Honda Motor Company, Limited, Honda Research and Development Company and American Honda Motor Company (collectively Honda) on behalf of Bradley.

Honda named Bradley's and Douglas' parents as third party defendants. Pursuant to Fed. R. Civ. P. 41(a), the parties stipulated on August 1, 1983 that all claims were dismissed without prejudice and without costs, and could be refiled in Pierce County Superior Court.

Baughn refiled his case in Pierce County on August 2, 1983. Douglas Bratz also filed suit against Honda on September 13, 1983. Bratz named all three Honda companies in his complaint, but American Honda Motor Company was the only defendant served and hence the only defendant involved in the Bratz suit. The trial judge ordered the cases consolidated on January 25, 1984. A guardian for Douglas was appointed on May 30, 1984 and filed an amended complaint on Douglas' behalf on June 29, 1984.

Ultimately, the trial court granted Honda's motions for summary judgment and dismissed the Bratz and Baughn claims. Baughn's motion for reconsideration was similarly denied.

Baughn appealed directly to this court and we accepted review.[1] Bratz appealed to the Court of Appeals, but later moved to transfer the appeal to this court and consolidate the two cases; we granted these motions.

There is a considerable degree of overlap in the issues presented in the 415 pages of briefs filed in this case, out of which emerges one ultimate issue.

ISSUE

Is a manufacturer liable when children are injured while riding one of its mini–trail bikes on a public road in violation of manufacturer and parental warnings?

DECISION

CONCLUSION. Where there are no design or manufacturing defects in the product, and where the warnings concerning its use are adequate, a manufacturer is not liable for an accident and resulting injuries. The mini–trail bike was, as its name implied, a "trail" bike. It was not designed or

---

[1]RAP 4.2.

equipped for on–the–road use. The accident in this case occurred because the boys who were injured ignored Honda's and their parents' warnings not to ride the mini-trail bike on streets and roadways, and because they ignored stop signs on the roadway and collided with a truck they had not seen because they were looking elsewhere. Honda is not legally responsible for the boys' injuries.

On appeal, Baughn argues that Honda is liable under the theories of negligence, breach of implied warranty, strict liability (Restatement (Second) of Torts § 402A (1965)) and misrepresentation (Restatement § 402B). Bratz discusses the same theories and adds a claim that Honda should be held liable for breach of express warranty.

██ Though the plaintiffs raise many issues under the heading of strict liability, the principal issue is Baughn's challenge to the standard set forth in *Tabert* for determining when a product may be considered defective, as is required in order to establish strict liability.[2] In *Tabert,* this court held that a manufacturer may be held strictly liable for manufacturing a defective product if that product is not reasonably safe. "This means that it must be unsafe to an extent beyond that which would be reasonably contemplated by the ordinary consumer."[3]

The *Tabert* "consumer expectations" test has been consistently applied by Washington courts in determining whether a manufacturer is strictly liable for manufacturing an unreasonably dangerous and therefore defective product.[4] *Tabert* is widely recognized as a leading case in set-

---

[2]*Novak v. Piggly Wiggly Puget Sound Co.,* 22 Wn. App. 407, 410, 591 P.2d 791 (1979).

[3]*Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 154, 542 P.2d 774 (1975).

[4]*See, e.g., Lenhardt v. Ford Motor Co.,* 102 Wn.2d 208, 211, 683 P.2d 1097 (1984); *Davis v. Globe Mach. Mfg. Co.,* 102 Wn.2d 68, 73, 684 P.2d 692 (1984); *Lamon v. McDonnell Douglas Corp.,* 91 Wn.2d 345, 350, 588 P.2d 1346 (1979); *Estate of Ryder v. Kelly–Springfield Tire Co.,* 91 Wn.2d 111, 117, 587 P.2d 160, 16 A.L.R.4th 129 (1978); *Bernal v. American Honda Motor Co.,* 87 Wn.2d 406, 411, 553 P.2d 107 (1976).

ting forth standards for imposing strict liability for a defective product.[5]

In determining a consumer's expectations regarding a product's safety, factors such as the relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating or minimizing the risk are to be considered.[6] Under *Tabert,* liability is not imposed simply because a product causes harm.[7] Rather, it must be shown that a product that caused harm was not reasonably safe.[8]

While usually called a "consumer expectations" test, the *Tabert* rule actually combines the consideration of consumer expectations with an analysis of the risk and utility inherent in a product's use. Thus, some commentators find it more accurate to call the *Tabert* test "a consumer expectations test with a risk–utility base."[9] Many good things have been said about this combination approach for the guidance it offers jurors in considering whether a product is defective.[10]

█ Baughn would have us adopt a rule that eliminates

---

[5]*See* J. Allee, *Product Liability* § 2.05[2][c], at 2–39 n.23 (1985); Ass'n of Trial Lawyers of Am., *Products Liability: The First Twenty–Five Years, Pt. I,* § 19–118, at 573–74 (1983); J. Beasley, *Products Liability and the Unreasonably Dangerous Requirement* 228–30 (1981); Annot., *Products Liability: Modern Cases Determining Whether Product Is Defectively Designed,* 96 A.L.R.3d 22, 48 (1979).

[6]*Tabert,* at 154.

[7]*Tabert,* at 150.

[8]*Tabert,* at 154.

[9]Birnbaum, *Unmasking the Test for Design Defect: From Negligence [to Warranty] to Strict Liability to Negligence,* 33 Vand. L. Rev. 593, 614 (1980); *see also* Twerski, Weinstein, Donaher & Piehler, *Shifting Perspectives in Products Liability: From Quality to Process Standards,* 55 N.Y.U. L. Rev. 347, 354 n.19 (1980); Comment; *The Design Defect Test in Washington: The Requisite Balance,* 8 U. Puget Sound L. Rev. 679, 686 (1985).

[10]J. Allee, § 2.05[2][c], at 2–40; Birnbaum, 33 Vand. L. Rev. at 614–15.

consideration of consumer expectations and balances only the risk and the utility of using a given product. Most jurisdictions that employ the risk–utility approach require that there be something wrong with the product before a risk–utility analysis is permitted.[11] Baughn, however, urges us to adopt the pure form of risk–utility analysis employed by the New Jersey Supreme Court in *O'Brien v. Muskin Corp.*, 94 N.J. 169, 463 A.2d 298 (1983). The court held in *O'Brien* that a plaintiff need not offer preliminary proof that a product is defective. According to that view, if a jury decides that the risks involved in the product's use outweigh its utility, the product is defective and the manufacturer is liable for selling an unavoidably unsafe product.[12]

The dissent in *O'Brien* charged that the majority's approach transformed strict product liability into absolute liability.[13] One commentator who agreed with the dissent observed that "although the majority's test theoretically distinguishes itself from absolute liability, the test is so expansive that, as a practical matter, sellers will face potential and unpredictable liability for almost any injury related to product use."[14] The *O'Brien* analysis has also been criticized on the ground that it will inevitably lead to inconsistent results:

> The [risk–utility] rule . . . at least as applied to products that have not malfunctioned or manifested something "wrong" with them, fails to provide any framework for reaching consistent decisions as applied to identical products under similar circumstances. The jury is, in effect, allowed to legislate in each particular case whether the manufacturer of a well–made product should insure its use.

*Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1274 n.68 (5th Cir.

---

[11]*See Perkins v. F.I.E. Corp.*, 762 F.2d 1250, 1272 (5th Cir. 1985).

[12]*O'Brien v. Muskin Corp.*, 94 N.J. 169, 186, 463 A.2d 298 (1983).

[13]*O'Brien*, at 192 (Schreiber, J., dissenting).

[14]Note, *Products Liability*, 15 Seton Hall L. Rev. 120 n.5 (1984).

1985); *see also* J. Allee, *Product Liability* § 2.05[2][e], at 2–48 to 2–49 (1985); Note, *Products Liability,* 15 Seton Hall L. Rev. 120, 141 (1984).

In *Tabert,*[15] we made clear the view of this court that

> The doctrine of strict liability does not impose legal responsibility simply because a product causes harm. Such a result would embody absolute liability which is not the import of strict liability.

We adhere to the principles enunciated in *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975) and decline to adopt the open–ended type of risk–utility analysis advocated by the plaintiffs herein. Nor do we deem it necessary to apply the type of risk–utility analysis previously mentioned that specifically requires preliminary proof of "something wrong".[16] Such a test does not radically differ from that articulated in *Tabert,* and we adhere to *Tabert.*

■ A comment to § 402A of the Restatement (Second) of Torts is dispositive of the plaintiffs' next contention that Honda should be held strictly liable for manufacturing an unreasonably unsafe or dangerous product. Comment *j* states that to prevent a product from being unreasonably dangerous, a seller may be required to give directions or warnings as to its use. The comment adds:

> Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

Restatement (Second) of Torts § 402A, comment *j* (1965).[17]

While our application of this comment effectively denies the parties' other strict liability claims, we will briefly discuss those claims in conjunction with similar issues raised

---

[15]*Tabert,* at 150.

[16]*See Perkins,* at 1272.

[17]*See Novak,* at 414.

under the theory of negligence. The warnings provided by Honda will be outlined in discussing the first such issue: whether Honda fulfilled its duty to warn of the mini–trail bike's potential dangers.

## Duty To Warn

Under the law of negligence, a defendant's duty is to exercise ordinary care.[18] A manufacturer's duty of ordinary care includes a duty to warn of hazards involved in the use of a product which are or should be known to the manufacturer.[19]

Under principles of strict liability, the manufacturer has a duty to design a product which is reasonably safe for its intended use.[20] Strict liability may be established if a product, though faultlessly manufactured, is unreasonably dangerous when placed in the hands of the ultimate user by a manufacturer without giving adequate warnings concerning the manner in which to use it safely.[21]

Honda placed warnings against using its mini–trail bike on public streets in a prominent place on the bike itself as well as in the owner's manual. The following warning appears in the owner's manual on the inside cover, set off by a bright red backdrop and encircled with dark ink for emphasis:

READ OWNER'S MANUAL CAREFULLY:
THIS VEHICLE WAS MANUFACTURED FOR OFF–THE–ROAD USE ONLY.
DO NOT OPERATE ON PUBLIC STREETS, ROADS, OR HIGHWAYS.

A second warning and an explanation appears on the first inside page of the owner's manual:

---

[18]*Gordon v. Deer Park Sch. Dist. 414,* 71 Wn.2d 119, 122, 426 P.2d 824 (1967).

[19]*Novak v. Piggly Wiggly Puget Sound Co.,* 22 Wn. App. 407, 412, 591 P.2d 791 (1979); Restatement (Second) of Torts § 388 (1965).

[20]*Galvan v. Prosser Packers, Inc.,* 83 Wn.2d 690, 694, 521 P.2d 929 (1974).

[21]*Teagle v. Fischer & Porter Co.,* 89 Wn.2d 149, 155, 570 P.2d 438 (1977); *Novak,* at 412.

Most Honda Mini–Trails will be operated by junior riders. In many instances, this is their initial introduction to the sport of motorcycling. Before your sons or daughters start to ride, it is important that you review the contents of this manual with them. A preliminary understanding of proper operation and maintenance will facilitate training and will contribute to their safety and the service life of the machine.

The Honda Z50A is designed and equipped for off–the–road use only and should not be operated on public streets. A mini–bike is less visible to traffic than larger machines. If the rider must cross a street to reach his riding area, then for safety and to comply with laws in many states, he should shut off the engine and walk the mini–bike across. When training your son or daughter, select a safe practice area with an even surface, free of obstacles.

The first page of the manual shows a drawing of a youthful rider, who is wearing a safety helmet and gloves, walking a mini–trail bike across a public street.

The mini–trail bike also had a warning label prominently displayed on top of the gas tank immediately in front of the operator. It read:

READ OWNER'S MANUAL CAREFULLY

THIS VEHICLE WAS MANUFACTURED FOR OFF–THE–ROAD USE ONLY. DO NOT OPERATE ON PUBLIC STREETS, ROADS OR HIGHWAYS.

Directly below the warning set forth above was another warning label, printed in even larger bold type. It read:

REMEMBER
PRESERVE NATURE
ALWAYS WEAR A HELMET
THINK SAFETY

Baughn and Bratz argue that these warnings were inadequate because they did not describe what might happen if a child did ride a mini–trail bike on a public street. They also criticize Honda for failing to advise parents how to determine if their child was ready to ride a mini–trail bike.

█ It is established law that a warning need not be given at all in instances where a danger is obvious or known.[22] Although public policy favors holding liable those who produce products causing injury, strict liability is not absolute liability.[23] "A manufacturer is not an insurer, and need not warn against hazards known to everyone."[24]

Baughn and Bratz contend, however, that a special duty to warn is owed when a manufacturer markets an item for children. They point to our recent decision in *Bauman v. Crawford*, 104 Wn.2d 241, 704 P.2d 1181 (1985) as signaling a new sensitivity to the special needs of children. In *Bauman,* we declined to apply a negligence per se standard to children, and instead adopted a special child's standard of care. Bratz and Baughn also point to § 390 of the Restatement (Second) of Torts in support of their claim that Honda should have addressed its warnings to children:

§ 390. Chattel for Use by Person Known To Be Incompetent.

One who supplies directly or through a third person a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use, is subject to liability for physical harm resulting to them.

█ We have phrased the question to be asked regarding a warning's sufficiency and the user's expectations in the following way: "Was the warning sufficient to catch the attention of persons who could be expected to use the product; to apprise them of its dangers and to advise them

---

[22]*Haysom v. Coleman Lantern Co.*, 89 Wn.2d 474, 479, 573 P.2d 785, 93 A.L.R.3d 86 (1978).

[23]*Kimble v. Waste Sys. Int'l, Inc.*, 23 Wn. App. 331, 339, 595 P.2d 569 (1979); *see also Seattle–First Nat'l Bank v. Tabert*, 86 Wn.2d 145, 150, 542 P.2d 774 (1975).

[24]*Kimble,* at 339.

of the measures to take to avoid those dangers?"[25] Under such a standard, the persons who will use the product—adults or children—should be able to understand a manufacturer's warnings of potential dangers and the ways to avoid them.

In *Novak v. Piggly Wiggly Puget Sound Co.*, 22 Wn. App. 407, 412, 591 P.2d 791 (1979), in which plaintiff argued liability both in negligence and strict liability, the Court of Appeals concluded that warnings on a BB gun sufficiently informed an 11-year-old of the dangers involved in its use. In that case, the minor plaintiff was struck in the eye by a ricocheting BB while watching a friend shoot his BB gun. The court pointed to several statements regarding the danger of ricochet in the gun's operator's manual, and observed that they were related to the precise danger encountered but were simply disregarded by the user.[26] "Whether under a strict liability or negligence theory, Daisy's warnings were sufficient to preclude liability."[27]

In another BB gun case argued solely in terms of strict liability, the court held that there was no duty to warn even a 7-year-old of obvious dangers:

A warning by the defendant Daisy that a BB gun, if fired at a person, could injure an eye, is nothing that even a seven-year-old child does not already know.

*Menard v. Newhall,* 135 Vt. 53, 56, 373 A.2d 505, 94 A.L.R.3d 287 (1977).

Finally, in the context of negligence, the First Circuit has observed that a failure to warn amounts to negligence only where the supplier of a dangerous good has no reason to believe that those for whom the good is supplied will realize

---

[25]*Little v. PPG Indus.,* 92 Wn.2d 118, 122, 594 P.2d 911 (1979).

[26]*Novak,* at 413–14.

[27]*Novak,* at 414.

its dangerous condition.[28] "'If this were not true, a manufacturer could not design and sell a pocket knife, axe, planer or gun.'"[29] Indeed, if the law required suppliers to warn of all obvious dangers inherent in a product, "'[t]he list of foolish practices warned against would be so long, it would fill a volume.'"[30]

Honda did not warn of every conceivable danger that could be encountered if children rode its mini–trail bikes on public streets and roadways. It did, however, specifically instruct that they were intended for off–the–road use only and that riders should wear helmets. There was no contention that Douglas or Bradley could not read the sticker prominently displayed on the mini–trail bike. There is no evidence that they read the owner's manual; Vernon Bratz said he only checked it to see how to adjust the mini–trail bike.

Honda did not inform parents how to determine if their child was ready to ride a mini–trail bike. In this case, however, both fathers owned motorcycles and had previously bought mini–trail bikes for their children which their children could ride. We cannot perceive that they did not think their children were ready to ride them.

While Honda did not warn Bradley and Douglas of the precise danger they eventually encountered, their parents did and did so repeatedly. The two boys were almost 9 years old. They were apparently normal children and undoubtedly knew that riding their mini–trail bikes on public roads and ignoring stop signs could cause them injury. Despite Honda's warnings and their parents' warnings, they rode into the street through several stop signs,

---

[28]*Plante v. Hobart Corp.,* 771 F.2d 617, 620 (1st Cir. 1985); *see also Fleming v. Stoddard Wendle Motor Co.,* 70 Wn.2d 465, 467, 423 P.2d 926 (1967).

[29]*Plante,* at 620.

[30]*Plante,* at 620 (quoting *Kerr v. Koemm,* 557 F. Supp. 283, 288 n.2 (S.D.N.Y. 1983)); *see also Little v. PPG Indus.,* 19 Wn. App. 812, 821 n.4, 579 P.2d 940 (1978), *modified on other grounds,* 92 Wn.2d 118, 594 P.2d 911 (1979).

did not watch where they were going and were injured when they collided with a truck they had not seen. The trial court did not err when it ruled that Honda satisfied its duty to warn under the law of negligence and strict liability.

## Proximate Cause

The second issue raised under the double heading of negligence and strict liability is whether the trial court erred when, as a matter of law, it held that Honda did not proximately cause the accident. Proximate cause is an essential element of both theories. Negligence requires duty, breach and resultant injury; and the breach of duty must be shown to be a proximate cause of the injury.[31] To make out a prima facie case in strict liability, a plaintiff must establish (1) that there was a defect in the product which existed when it left the manufacturer's hands; (2) that the defect was not known to the user; (3) that the defect rendered the product unreasonably dangerous; and (4) that the defect was the proximate cause of the injury.[32]

Proximate cause includes two elements: cause in fact and legal causation.[33] Cause in fact refers to the "but for" consequences of an act—the physical connection between an act and an injury.[34] While the question of cause in fact is generally for the jury, when the facts are undisputed and the inferences therefrom are plain and incapable of reasonable doubt or difference of opinion, factual causation may become a question of law for the court.[35]

---

[31]*Hartley v. State,* 103 Wn.2d 768, 777, 698 P.2d 77 (1985); *Pedroza v. Bryant,* 101 Wn.2d 226, 228, 677 P.2d 166 (1984).

[32]*Novak,* at 410; *Haugen v. Minnesota Mining & Mfg. Co.,* 15 Wn. App. 379, 382, 550 P.2d 71 (1976).

[33]*Hartley,* at 777; *Harbeson v. Parke–Davis, Inc.,* 98 Wn.2d 460, 475, 656 P.2d 483 (1983).

[34]*Hartley,* at 778.

[35]*Daugert v. Pappas,* 104 Wn.2d 254, 257, 704 P.2d 600 (1985); *LaPlante v. State,* 85 Wn.2d 154, 159–60, 531 P.2d 299 (1975).

Baughn and Bratz claim that several defects in the manufacturing and marketing of the mini–trail bike caused the boys' injuries. They also raise the issue of warnings once again in the context of their claim that inadequate warnings caused the accident.

A charge of inadequate warnings formed the basis of a proximate cause argument in *Sherk v. Daisy–Heddon,* 498 Pa. 594, 450 A.2d 615 (1982). *Sherk* arose when a boy died after his 14–year–old friend, Robert Saenz, shot him with a BB gun. On the day of the mishap, Saenz used the gun without permission and without having read the gun's instructions. The claimed defect was the manufacturer's failure to warn adequately of the gun's lethal propensity.[36] A concurring opinion elaborated on the court's conclusion that defective warnings did not cause Sherk's death. "Regardless of whether Daisy's warnings were inadequate, . . . plaintiff failed to establish causation because Saenz and his parents knew the risks which an adequate warning would have described and acted without regard to them."[37] That opinion then described the relationship of cause in fact and inadequate warnings under a strict liability theory:

> The liability imposed on manufacturers of defective products is denominated strict, or without fault, because the usual requirement that plaintiff show a breach of duty has been eliminated, or attenuated to the point of elimination. . . . However, plaintiff must prove a defect existed in the product at the time of the accident and that this defect was the proximate cause of plaintiff's injuries. . . .
>
> . . . the product is defective under the doctrine of strict liability if it is unreasonably dangerous without an adequate warning and no such warning is provided. *Where the actor knows risk is present and still chooses to act without regard to it, the warning serves no purpose in preventing the particular harm.*

---

[36]*Sherk v. Daisy–Heddon*, 498 Pa. 594, 598, 450 A.2d 615 (1982).

[37]*Sherk,* at 604 (Hutchinson, J., concurring).

(Italics ours.) *Sherk,* at 605–06 (Hutchinson, J., concurring).

In the case before us, the warnings by Honda, whether deemed adequate or not, were not a cause in fact of the accident. We agree with the trial court that "this collision would have occurred even if there had been . . . warnings describing in more vivid detail that death or serious injury may result because children may not follow instructions not to use the bike on the streets . . ."[38] Both children had been warned not to ride mini–trail bikes in the street. These warnings had been given by their parents, who were themselves experienced motorcyclists. Neither Vernon Bratz nor his children paid much, if any, attention to the owner's manual. Vernon Bratz bought the mini–trail bike without asking the salesman for additional information. "I didn't need the literature. Like I say, I already knew about the bike. I didn't even have to ask him anything. I knew what it did." Several experts testified that Honda's advertising about the mini–trail bike was inadequate in light of the hazards it presented. To say that Bratz would not have bought the mini–trail bike if the warnings had been stronger, however, is purely speculative.[39] Under the facts of this case, the content of the warnings, or lack thereof, did not cause the accident.

Baughn alleges that several design defects also caused the boys' injuries. Baughn first contends that the product was defectively designed because it had an on–off switch instead of an ignition key. This is not a case where the mini–trail bike was used without parental permission. Vernon Bratz left saying his children could ride it that afternoon. Whether it had an on–off switch, as contrasted with an ignition key, was thus immaterial.

Baughn also alleges that the mini–trail bike was defective

---

[38] Memorandum decision denying motion for reconsideration, Clerk's Papers, at 1561.

[39] *See Day v. Volkswagenwerk Aktiengesellschaft,* 451 F. Supp. 4, 6 (E.D. Pa. 1977).

because it lacked an automatic governor to control its speed. The mini–trail bike had a top speed of 35 m.p.h., although the maximum speed could be limited to 22 to 25 m.p.h. through installation of a special throttle valve. The sole witness to present evidence on the issue of speed, Donna Tillman, estimated that the bike was going about 20 m.p.h. when it collided with the truck, so there is nothing to establish that an automatic governor could have prevented the accident. As one expert expressed it,

> if he's not intending to stop for a stop sign and he's not looking where he's going . . . then it doesn't much matter. He could be going 5 miles an hour, on a skateboard, on roller skates, on a bicycle.

Baughn also argues that an excessively large seat on the mini–trail bike caused the accident. The seat enabled Bradley to ride as a passenger on the bike, even though it was designed to carry the operator only. Even if the seat was larger than necessary, however, it cannot be said that but for the large seat, the accident would not have occurred.

Baughn also asserts that the low visibility of the mini–trail bike was a factual cause of the accident. The driver of the truck testified that he did not see the mini–trail bike before the collision; he just felt its impact. The owner's manual referred to the low visibility of the mini–trail bike in stating that if a rider must cross a street, the engine should be shut off and the machine walked across the street. Under these circumstances, additional warnings about low visibility would not have prevented the accident. The record is devoid of evidence that the truck driver looked in the direction of the Bratz mini–trail bike before the accident occurred. The trial judge did not err in concluding that Honda's acts or omissions were not the factual cause of the collision:

> In this case the children had been warned and disciplined not to use the bike on the street. The parents were experienced motorcyclists. The warnings were clear that the bike was not to be used on the streets, and it was

dangerous to do so because of low visibility. Mr. Bratz had given the children permission to use the bike that very day, and Mrs. Bratz knowingly allowed continued riding on the street. The alleged defects and lack of warnings clearly had nothing to do with the collision.[40]

The second prong of proximate cause is legal causation. Legal causation rests on policy considerations as to how far the consequences of a defendant's acts should extend.[41] "It involves a determination of whether liability *should* attach as a matter of law given the existence of cause in fact."[42] While we do not find that factual causation exists, we will briefly discuss our reasons for similarly rejecting a finding of legal causation.

■ In *Pratt v. Thomas*, 80 Wn.2d 117, 119, 491 P.2d 1285 (1971), this court declined to find legal causation between a defendant's actions in leaving a car unlocked and a car thief's injuries:

> Here it is plain the accident which caused appellant's injuries was not a part of the natural and continuous sequence of events which flowed from respondents' act in leaving their station wagon in the parking lot. It was the result of new and independent forces. Among the new forces were the stealing of the vehicle, the pursuit by the state patrol, the attempt by the thieves to run from the officers and, finally, the accident.

Honda argues that the boys' misuse of the mini–trail bike was a "new and independent force" that broke the chain of causation between its manufacturing process and the boys' injuries. Baughn and Bratz argue that if Honda hadn't made the mini–trail bike, no accident would have occurred. Baughn and Bratz cite the testimony of an expert who stated that the mini–trail bike should not be sold: "[A]ny-thing that has a potential to put a child out in traffic when a kid is down here on the ground and is hardly visible is not

---

[40]Memorandum opinion denying reconsideration, Clerk's Papers, at 1561.

[41]*Hartley,* at 779.

[42]*Hartley v. State,* 103 Wn.2d 768, 779, 698 P.2d 77 (1985).

going to be safe at any speed."

The idea that a manufacturer is liable for making a product that is potentially dangerous was discussed in *DeRosa v. Remington Arms Co.,* 509 F. Supp. 762 (E.D. N.Y. 1981). In *DeRosa,* the widow of a police officer sued a gun manufacturer after her husband was accidentally killed by a fellow officer. She charged that the trigger pull force was designed to be so low that the gun was unreasonably dangerous for its foreseeable use in police work. The court rejected this argument, stating:

> The manufacturer's duty:
>> does not extend to designing a product that is impossible to abuse or one whose safety features may not be circumvented. A manufacturer need not incorporate safety features into its product so as to guarantee that no harm will come to every user [or bystander] no matter how careless or even reckless [the user may be.]

*DeRosa,* at 769, quoting *Robinson v. Reed–Prentice Div.,* 49 N.Y.2d 471, 403 N.E.2d 440, 426 N.Y.S.2d 717, 721 (1980). The court added that many well built and well designed products may cause injury or death:

> Guns may kill; knives may maim; liquor may cause alcoholism; but the mere fact of injury does not entitle the [person injured] to recover . . . there must be something wrong with the product, and if nothing is wrong there will be no liability.

*DeRosa,* at 769, quoting A. Murphy & K. Santagata, *Analyzing Product Liability* 4 (1979).

Plaintiffs have simply not shown that there was "something wrong" with the mini–trail bike or that the warnings were inadequate. Nor does anything indicate that the driver had trouble handling it. Many products used by children may be capable of causing injury, but that alone does not mean they should be removed from the market; as the Supreme Court of Illinois expressed it, "[a] baseball, a baseball bat, a penknife, a Boy Scout hatchet, a bicycle, all have the capacity to injure the user or others in the course

of their normal use."[43] A psychologist testified that the decision as to whether any product, which is potentially dangerous in this sense, is appropriate for a given child is perhaps best left up to the parent. As he expressed it:

> You always have to make a judgment with any toy that you buy a child or anything, really, whether or not that child has the strength, the emotional maturity or whatever else is necessary to deal with that particular item properly and safely, and only the parent can make that judgment. . . .

### Misrepresentation

Baughn and Bratz also claim that Honda is strictly liable for misrepresentation under Restatement (Second) of Torts § 402B (1965) which reads:

> § 402B. Misrepresentation by Seller of Chattels to Consumer.
>
> One engaged in the business of selling chattels who, by advertising, labels, or otherwise, makes to the public a *misrepresentation of a material fact concerning the character or quality* of a chattel sold by him is subject to liability for physical harm to a consumer of the chattel caused by justifiable reliance upon the misrepresentation, even though
>
> (a) it is not made fraudulently or negligently, and
> (b) the consumer has not bought the chattel from or entered into any contractual relation with the seller.

This court applied § 402B in *Arrow Transp. Co. v. A.O. Smith Co.*, 75 Wn.2d 843, 849, 454 P.2d 387 (1969).

Unlike § 402A, § 402B requires neither a defective product nor one that is unreasonably dangerous. Rather, the rule stems from the concept of express warranty by advertising.[44] In adopting § 402B, the Colorado Supreme Court declared that "it is sound policy to permit a consumer, who purchases a product on the strength of the manufacturer's representations, to obtain direct recovery

---

[43]*Pitts v. Basile*, 35 Ill. 2d 49, 51, 219 N.E.2d 472 (1966).

[44]*American Safety Equip. Corp. v. Winkler*, 640 P.2d 216, 219 (Colo. 1982).

from the manufacturer on a theory of strict liability."[45] The Colorado court pointed out, however, that nothing in § 402B imposes an insurer status upon the manufacturer.

Three requirements must be met in order to establish a prima facie case under § 402B: (1) there must be a misrepresentation of a material fact concerning the character or quality of a chattel; (2) the misrepresentation must be made to the public; and (3) physical harm must have resulted to a consumer from justifiable reliance upon the misrepresentation.[46]

Baughn charges that Honda is liable for misrepresentation, primarily because of the following three statements in the owner's manual:

The Honda Z50A *is equipped with a safety device* to limit power and speed while a new rider is learning to operate the machine.

\* \* \*

Maximum speed setting of your mini–trail can be lowered *for safe riding of unskilled riders or children.*

\* \* \*

The maximum speed of this Mini–Trail can be lowered, if required, by replacing the throttle valve. *This feature assures safe riding for a beginner.*

(Italics are by Baughn.) These statements are not particularly relevant here since the throttle device never was installed on the Bratz mini–trail bike. In addition, all of these statements are qualified by the explicit manual instructions that the mini–trail bike is for trail use only and *not* for use on the streets and roadways. The statements referred to do not guarantee safety; they say that the mini–trail bike will be safe if the device is installed. Even should we view these as misrepresentations of material facts, there is still no showing that the Baughns relied on or even knew of them. If Vernon Bratz had relied on Honda's statements,

---

[45]*American Safety,* at 220.

[46]*American Safety,* at 222.

however, that reliance could be imputed to the Baughns.[47] Comment *j* to § 402B states that the reliance need not be that of the injured consumer, but may be that of the chattel's purchaser who passes the product along because of such reliance.

Vernon Bratz does not contend, however, that he relied on any statements in the owner's manual. He testified that he checked the manual only to see if the mini–trail bike needed adjustments. Section 402B does not apply where the misrepresentation is not known, or there is indifference to it, and it does not influence the purchase or subsequent conduct.[48]

The Bratz brief makes no specific references to advertisements or sales information that Vernon Bratz claims he relied upon. In his deposition, Bratz testified that he bought the mini–trail bike because of television ads that said "You meet the nicest people on a Honda", described the mini–trail bike as a very good bike for children and showed children riding minibikes. Mr. Bratz declined to take any literature other than the owner's manual, and did not ask the dealer any questions about it.

Mr. Bratz thus seemed most influenced by the television commercials. Comment *g* to § 402B notes that the rule does not apply to loose general praise of goods sold known as sales talk or puffing. The television ads which he describes fit this description. The trial court did not err by dismissing the misrepresentation claims.

### Warranty

Both parties also charge Honda with breach of warranty. Baughn alleges breach of implied warranty; Bratz alleges breach of express and implied warranty. These theories are now part of a product liability action under the tort reform

---

[47]Restatement (Second) of Torts § 402B, comment *j* (1965).

[48]Restatement (Second) of Torts § 402B, comment *j* (1965); *see also Arrow Transp. Co. v. A.O. Smith Co.*, 75 Wn.2d 843, 849, 454 P.2d 387 (1969).

act.[49] The act does not apply here, however, since the accident occurred before its enactment.[50]

■ Even before the tort reform act, however, the continued viability of a separate theory of implied warranty in tort was questioned. When this court adopted the theory of strict liability in *Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 452 P.2d 729 (1969), it stated that in so doing it was discarding the terminology of "implied warranty" as applied to the liability of manufacturers.[51] A federal court, noting this language, concluded that "[t]he concept of a common law implied warranty action without privity as it was known prior to *Ulmer*, no longer exists."[52] The Court of Appeals recently reached the same conclusion in *Gates v. Standard Brands Inc.*, 43 Wn. App. 520, 527, 719 P.2d 130 (1986). We agree and hold that the plaintiffs may not maintain a separate implied warranty in tort claim.

Nor may Bratz recover for breach of express or implied warranty under the Uniform Commercial Code (UCC).[53] Contractual privity between buyer and seller traditionally has been required before a plaintiff may maintain such an action under the Code.[54] Such privity is absent here since Bratz sued the manufacturer rather than the dealer who sold him the mini–trail bike. Bratz thus may not bring an implied warranty action under the UCC.[55]

■ The privity requirement is relaxed, however, when a manufacturer makes express representations, in advertis-

---

[49]*See* RCW 7.72.010(4).

[50]*See Lenhardt v. Ford Motor Co.*, 102 Wn.2d 208, 683 P.2d 1097 (1984).

[51]*Ulmer v. Ford Motor Co.*, 75 Wn.2d 522, 532, 452 P.2d 729 (1969).

[52]*Chance v. Richards Mfg. Co.*, 499 F. Supp. 102, 104 (E.D. Wash. 1980).

[53]*See* RCW 62A.2–313, .2–314, .2–315.

[54]*See Daughtry v. Jet Aeration Co.*, 91 Wn.2d 704, 711, 592 P.2d 631 (1979); *Berg v. General Motors Corp.*, 87 Wn.2d 584, 594, 555 P.2d 818 (1976).

[55]*Chance*, at 105.

ing or otherwise, to a plaintiff.[56] Although the UCC does not require a plaintiff to show reliance on the manufacturer's statements, he or she must at least be aware of such representations to recover for their breach.[57] Here, the only statements made by Honda of which Bratz was aware described the mini–trail bike as a good one for children and stated that "You meet the nicest people on a Honda." Such statements do not rise to the level of express representations for which recovery under the UCC is allowed.[58] Rather, they appear to be Honda's opinion or commendation regarding minibikes rather than affirmations of fact about the goods.[59] The trial court did not err in dismissing the express warranty claim.

One additional issue—this one raised by Honda—also bears note. Honda argues that the Baughn action is barred by the statute of limitations because Mr. Baughn waited too long to sue Honda following his appointment as Bradley's *general* guardian. Honda argues that an incompetent's youth or mental disability does not toll the statute of limitations once a general guardian is appointed.[60] Rather, according to Honda's argument, the statute runs from the time of a general guardian's appointment.[61]

We note that the applicable statute of limitations here is the 3–year statute, RCW 4.16.080(2), and that Baughn's attorney did not file suit until 4 years after Mr. Baughn's appointment as Bradley's general guardian. Because we have resolved the other issues on the bases stated, however,

---

[56]J. White & R. Summers, *Uniform Commercial Code* § 11–7, at 410 (2d ed. 1980).

[57]*See* J. White, § 9–4, at 336.

[58]*See* RCW 62A.2–313(1)(a), 2–313(2).

[59]*See* J. White, § 9–3, at 329.

[60]*See* RCW 4.16.190.

[61]*See* RCW 11.92.060(1).

we need not resolve the statute of limitations issue in this case.

The trial court did not err when it granted Honda's motions for summary judgment on the issue of liability and dismissed the actions.

Affirmed.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, GOODLOE, and DURHAM, JJ., concur.