[No. 21302-4-I.   Division One.   January 17, 1989.]

JOHN J. FALK, ET AL, *Appellants,* v. KEENE CORPORATION, ET AL, *Respondents.*

*William S. Bailey* and *Schroeter, Goldmark & Bender,* for appellants.

*Steven T. Johnson* and *Gibson, Dunn & Crutcher,* for respondents Keene Corp., et al.

*Daniel W. Ferm, Williams, Kastner & Gibbs, Mark S. Clark, Gregory E. Keller,* and *Laurie Chyz,* for respondent Eagle Picher Industries.

COLEMAN, C.J.—Marjorie Falk appeals from the judgment for defendants entered in the personal injury action she and her husband, John, now deceased, filed against various manufacturers of asbestos products. Falk alleges error in the jury instructions, in the limits placed on cross examination of several witnesses, and in the court's decision

to preclude certain witnesses from testifying. We reverse and remand this cause for a new trial.

The Falks filed this action after Mr. Falk was diagnosed as having malignant mesothelioma, a disease often related to asbestos exposure. Mr. Falk claimed to have been exposed to asbestos insulation products while serving in the United States Navy between 1947 and 1953.

The court granted defendants' pretrial motion to strike from the witness list two pathologists the Falks had hoped to call regarding Mr. Falk's diagnosis. The trial then began on June 3, 1987. The defendants were aligned in two defense teams—the "Wellington" group (a pool of asbestos manufacturers) and Raymark Industries, Inc.

At trial the court limited the Falks' cross examination of one defense witness, Dr. Demopoulos, to Wellington only, refusing to allow appellants to use certain Raymark documents to conduct the cross examination. The court also prohibited the Falks from cross–examining another defense expert, Dr. Hammar, regarding his diagnosis of Mr. Falk's disease. The trial court refused to give the Falks' requested instruction on product liability.

The jury returned a defense verdict on liability on July 20, 1987. The Falks then pursued this timely appeal.

We first address whether the trial court erred by refusing to give appellants' requested instruction on product liability and giving instead the instruction respondents requested.

> The test for sufficiency of instructions is whether the instructions, read as a whole, allow counsel to argue their theory of the case, are not misleading, and properly inform the trier of fact of the applicable law. *State v. Mark*, 94 Wn.2d 520, 618 P.2d 73 (1980); *Braxton v. Rotec Indus., Inc.*, 30 Wn. App. 221, 633 P.2d 897 (1981).

*Gammon v. Clark Equip. Co.*, 104 Wn.2d 613, 617, 707 P.2d 685 (1985). The appellant argues that the challenged instruction misstated the law and allowed respondents to

take advantage of this misstatement during closing argument. If instructions taken as a whole misstate the law and that misstatement is prejudicial, reversible error has occurred. *Gates v. Standard Brands, Inc.*, 43 Wn. App. 520, 530, 719 P.2d 130, *review denied*, 106 Wn.2d 1012 (1986).

In the instant case, appellants requested an instruction on design defect based on a product liability instruction approved in *Couch v. Mine Safety Appliances Co.*, 107 Wn.2d 232, 728 P.2d 585 (1986).[1] The instruction given by the court was based on WPI 110.02 (1984).[2] Appellants

---

[1]Appellants' proposed instruction (plaintiffs' proposed instruction 25) was copied virtually verbatim from the second and third paragraphs of the instruction in *Couch*, at 236.

"A product is not reasonably safe as designed, if, at the time of manufacture, it is unsafe as designed to an extent beyond that which would be contemplated by the ordinary user, or if the likelihood that the product would cause injury or damage and the seriousness of the injury or damage, outweighed the burden on the manufacturer to design a product that would have prevented the injury or damage and outweighed the adverse effect that an alternate design that was practical and feasible would have on the usefulness of the product.

"In determining what an ordinary user would reasonably expect, you should consider the relative cost of the product, the cost and feasibility of eliminating or minimizing the risk, the circumstances and conditions under which the products will normally be used, and such other factors as the nature of the product and the claimed defect indicate are appropriate."

[2]The instruction given to the jury, which conformed in every significant respect to WPI 110.02 then in effect, provided:

"A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of a manufacturer in that the product was not reasonably safe as designed at the time it left the manufacturer's control.

"A product is not reasonably safe as designed, if, at the time of manufacture, the likelihood that the product would cause injury or damage similar to that claimed by plaintiff, and the seriousness of such injury or damage, outweighed the burden on the manufacturer to design a product that would have prevented the injury or damage and outweighed the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product.

"In determining whether a product was not reasonably safe, you shall consider whether the product was unsafe to an extent beyond that which would be contemplated by an ordinary user."

properly objected to the instruction, in particular to its use of the word "negligence." The court gave additional standard instructions explaining the legal definition of negligence.[3]

The word "negligence" appeared in the WPI products liability instruction as a result of the tort and product liability reform act of 1981, Laws of 1981, ch. 27. The act itself contains a reference to *negligence*:

> A product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the negligence of the manufacturer in that the product was not reasonably safe as designed or not reasonably safe because adequate warnings or instructions were not provided.

RCW 7.72.030(1). The *Couch* court noted that the act's drafters referred to a negligence standard for design defect only because ·

> "[t]he Washington court, while terming the liability in such cases as one of strict liability, has articulated a test which upon closer analysis involves the balancing of factors more akin to negligence." Senate Journal, 47th Legislature (1981), at 624 (citing *Seattle–First Nat'l Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975)). . . .
> . . . We find that the Act adopted the *Tabert* tests for defective design cases against manufacturers, notwithstanding its reference to negligence.

*Couch,* at 239 n.5. The *Tabert* analysis for products liability is generally referred to as "strict liability." *Seattle–First*

---

[3]Respondents note that appellants failed to object to the court's instructions on negligence. Respondents argue that since appellants' objection is not just to the design defect instruction, but is really to the relationship between it and the negligence instructions, the issue was waived under *Ralston v. Vessey,* 43 Wn.2d 76, 260 P.2d 324 (1953). We disagree. It would have been futile for the appellants to object to the negligence instructions given the trial court's acceptance of respondents' arguments regarding the design defect instruction. Moreover, the trial court was fully aware of the nature of appellants' exception, and that is enough to preserve the error for appellate review. *Haslund v. Seattle,* 86 Wn.2d 607, 614–15, 547 P.2d 1221 (1976). Finally, we also believe, for reasons discussed *infra,* that even standing alone, the design defect instruction was sufficiently defective to merit reversal.

*Nat'l Bank v. Tabert,* 86 Wn.2d 145, 154, 542 P.2d 774 (1975).

Appellant argues that the jury would be confused by the court's instruction since it uses the term "negligence" to refer to a products liability test traditionally called "strict liability." Appellant also argues that the submission of the additional negligence instructions along with the WPI design defect instruction, which includes the word "negligence," was error because it invited the jury to apply a negligence standard, whereas the appropriate legal standard for design defect is strict liability as enunciated in *Tabert,* at 154.

Conversely, respondents have seized upon the footnote in *Couch,* at 239 n.5 that notes this State's products liability test is "more akin to" the traditional negligence test, to argue that *Couch* holds that because the *Tabert* consumer expectations test involves balancing, products liability actions for design defect in this state are decided by a negligence standard.[4]

It is apparent from respondents' closing argument that they believed and argued to the jury, as the given design defect instruction permitted them to, that negligence is the

---

[4]The trial court gave respondents' proposed instruction despite the indication in the comment to WPI 110.02 that the WPI committee was uncertain as to its sufficiency:

RCW 7.72.030(1). The first sentence of the instruction is substantially in the language of the statute although it may not be as clear to jurors as would be desired. The Committee has considered arguments on the one hand that the only duty under the statute is a duty of ordinary care, and on the other hand that the prior law of strict liability still applies because it is not specifically modified by the statute (RCW 7.72.020), and because RCW 7.72.030 does not use the word "only" which appears in RCW 7.72.040 for liability of sellers other than a manufacturer. The statute must be interpreted by courts considering instructions requested by trial attorneys. The Committee does not have any guidance from any appellate decisions at this time and should not prejudge legal issues. The Committee therefore has proposed the statutory language in the first sentence of the instruction and cautions users of WPI to prepare their own instructions case by case to supplement or replace the language of the statute.

WPI 110.02 comment (Supp. 1984).

standard for liability in this kind of products liability action.

Both of these instructions [failure to warn and design defect] require you to find negligence, and negligence is defined as, "the failure to exercise ordinary care," which is the care that a reasonably careful person would not do under the same or similar circumstances.

. . .

Now I don't want to get ahead of myself. We will look at instruction 11 A [design defect]. Same thing. They have to prove that the defendants were negligent, and that involves showing that their negligence related to not making a change in their product, and their claim is having asbestos as a component in their product.

■ Appellant insists that strict liability remains the standard for design defect products liability actions in this state. We agree. Our Supreme Court in *Couch* clearly held that the *Tabert* test is to apply to design defect claims. *Couch,* at 239 n.5. The *Tabert* test, while it involves balancing and in that regard may be considered "akin" to negligence, is nonetheless a strict liability analysis. It focuses on a manufacturer's defective product, the burden of an alternative design, and consumer expectations. As such, it is a fundamentally and irreconcilably different analysis from negligence, which focuses on a manufacturer's conduct. Thus, we disagree with respondents' argument that the *Tabert* analysis is merely a specialized negligence instruction and that its presence alongside the standard negligence definition would not be misleading.

When jurors encounter the word "negligence" in this design defect instruction, they are likely to consider the term, no matter how it is characterized within the instruction, in light of the negligence definition contained in the standard negligence instructions. In doing so, they will incorporate elements of the ordinary care definition of negligence into an instruction that should set forth a strict liability standard.

The jury in this case, relying on these instructions, could have found that the product was unreasonably dangerous,

yet not find liability because the manufacturer exercised ordinary care. Because the instructions allowed the jury to speculate as to negligence for design defect liability, prejudicial error occurred. *See Albin v. National Bank of Commerce,* 60 Wn.2d 745, 754, 375 P.2d 487 (1962) (it is prejudicial error to give instruction on a theory for which there is no substantial evidence because the mere act of submitting the instruction suggests to the jurors that there must be some evidence on the issue, encouraging them to speculate).

Finally, we note that even standing alone, the design defect instruction given in this case is defective. The reference to negligence is likely to confuse the ordinary, reasonable juror. The word connotes, in everyday usage, a concept of fault that is contradictory to the strict liability analysis the jury is asked to apply. As such, the instruction is misleading and invites the jury to misapply the law.[5]

The correctness of this analysis is supported by recent changes in the pattern design defect instruction set forth in WPI 110.02. On May 15, 1988, the WPI committee approved a new design defect instruction which does not include the word "negligence."[6] The committee's comment is instructive:

---

[5]We note an additional defect in the instruction. The instruction presented to the jury in this case, see footnote 2, impermissibly placed the burden on the plaintiffs to prove there was a reasonably safe alternative design. The existence of an alternative design is a factor which may, rather than must, be proven to show that a product is unreasonably safe as designed. *Connor v. Skagit Corp.,* 99 Wn.2d 709, 715, 664 P.2d 1208 (1983). The recently approved WPI instruction also appears to remedy this defect. While this portion of the instruction was not properly excepted to at trial, we note that upon retrial, the proper standard should be reflected in the instruction.

[6]The new instruction reads as follows:
"MANUFACTURER'S DUTY—DESIGN
"A manufacturer has a duty to design products which are reasonably safe. A manufacturer is subject to liability if the product was not reasonably safe as designed at the time it left the manufacturer's control and this was a proximate cause of the plaintiff's [injury] [and] [or] [damage].
"A product is not reasonably safe as designed, if:

"The term 'negligence' has not been included in this instruction because the Supreme Court has found that RCW 7.72.030(1) and RCW 7.72.030(1)(a) adopt the strict liability test set forth in *Seattle–First National Bank v. Tabert,* 86 Wn.2d 145, 542 P.2d 774 (1975), for defective design cases against manufacturers, notwithstanding the reference in RCW 7.72.020(1) to negligence. *Couch v. Mine Safety Appliances Co.,* 107 Wn.2d 232, 239 n.5, 728 P.2d 585 (1986). *Tabert* imposes strict liability for design defects if the product is not reasonably safe. A product is not reasonably safe if it is unsafe to an extent beyond that which would be contemplated by the ordinary consumer as determined by factors such as the relative cost of the product, the gravity of the potential harm from the claimed defect and the cost and feasibility of eliminating a [*sic*] minimizing the risk. *Seattle–First National Bank v. Tabert, supra* at 154.

Thus, resolution of this issue by the committee on pattern instructions is consistent with our analysis.

For the above reasons, we find that the trial court's instruction on design defect was erroneous. While our resolution of this issue is dispositive of this appeal, we nonetheless address the remaining issues because of the likelihood that they will arise again on retrial.

We next address whether the trial court erred by limiting appellant's cross examination of Dr. Demopoulos, respondents' key expert witness.

At trial, appellants sought to cross–examine Dr. Demopoulos by using the Sumner Simpson papers, a collection of documents produced by respondent Raymark's predecessor

"[at the time of manufacture, the likelihood that the product would cause injury or damage similar to that claimed by the claimant, and the seriousness of such injury or damage, outweighed the burden of the manufacturer to design a product that would have prevented the injury or damage and outweighed the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product;] [or]

"[the product is unsafe to an extent beyond that which would be contemplated by an ordinary user. In determining what an ordinary user would reasonably expect, you should consider [the relative cost of the product] [the seriousness of the potential harm from the claimed defect] [the cost and feasibility of eliminating or minimizing the risk] [and] such [other] factors as the nature of the product and the claimed defect indicate are appropriate.]"

corporation, Raybestos–Manhattan, in the 1930's that appellants claim indicate that the asbestos industry had actual knowledge even then of the health hazard posed by asbestos. Dr. Demopoulos gave wide ranging testimony regarding the history of the medical community's understanding of the medical effects of human exposure to asbestos. Initially, defendant Raymark reserved "the right to direct and . . . to use the general information [from Dr. Demopoulos's testimony] in closing argument." Once, however, it was apparent that appellants sought to cross–examine Dr. Demopoulos by using the Sumner Simpson papers, then Raymark announced its intent to withdraw from any use of the witness's testimony, neither conducting direct examination of him, nor using his testimony in closing argument. The court then ruled:

> All right, my feeling is that if Raymark is not going to use any of the testimony, in closing, by the doctor, and Raymark did not call this doctor as its witness, and said they will not draw on anything the doctor has said in their closing, then I think it's only fair to say that nothing—none of Raymark's documents should be used in examining this witness.

The scope of cross examination of an expert witness is within the sound discretion of the trial court and will not be overturned on appeal absent abuse of discretion. *Miller v. Peterson*, 42 Wn. App. 822, 827, 714 P.2d 695, *review denied*, 106 Wn.2d 1006 (1986). A trial court abuses it discretion when its decision is unreasonable or based on untenable grounds. *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971).

The court's discretion in controlling cross examination is guided by ER 611(b), which provides:

> Cross examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination.

A party has the right to liberal cross examination on issues of bias, hostility, or interest. *State v. Robbins,* 35 Wn.2d 389, 395–96, 213 P.2d 310 (1950).

The trial court had two bases for its decision to limit the scope of cross examination: (1) Dr. Demopoulos was a "Wellington" witness, but the documents upon which appellants sought to cross-examine him originated from Raymark; and (2) the court ruled the since "[t]his witness says he doesn't know anything about the Sumner–Simpson documents, then it would be a collateral fact. You are bound by the witness on a collateral matter." As to the first basis, appellant argues that the documents, although originating from Raymark, reflect an industrywide attempt to suppress medical information indicating the hazard posed by asbestos. As such, they would be pertinent to the "state of the art" defense interposed by all defendants. Moreover, the "withdrawal" of Raymark would not remove appellants' principal concern in using these materials to probe the witnesses' bias and competence. Therefore, we do not find that Raymark's withdrawal provided a tenable basis for limiting the cross examination.

The second basis for the court's ruling was the fact that Dr. Demopoulos denied having read or having been otherwise made familiar with these documents. We do not regard Dr. Demopoulos's failure to acquaint himself with these apparently critical documents as collateral. 5 K. Tegland, Wash. Prac. § 225, at 463 (2d ed. 1982) (impeachment and matters relevant to bias or interest are not collateral matters on cross examination). While noting that the trial court may wish to permit broader cross examination of Dr. Demopoulos on retrial, we nonetheless conclude that the court's limitations on the cross examination of Dr. Demopoulos did not prejudice appellants' ability to impeach him.

■ The court refused to allow appellants' counsel to read from or hand to Dr. Demopoulos documents from the Sumner Simpson papers. Appellants' counsel, however, was permitted to ask Dr. Demopoulos questions along the line

of what impact the kind of information in the Sumner Simpson papers would have on his opinions. Moreover, appellant was permitted to ask Dr. Demopoulos whether he had read the documents, which Dr. Demopoulos denied doing. These documents were already in evidence at the time of Dr. Demopoulos's cross examination, having been introduced via appellants' expert, Dr. Hake. Thus, the contents and importance of these documents were known to the jury at the time of the cross examination. Appellants, therefore, had full opportunity to make the same arguments in closing as to Dr. Demopoulos's bias, his competence as an expert, and the weight that should be given to his testimony that they would have made if the court had allowed appellants to use the documents to perform the cross examination. Accordingly, because the trial court's limits on Dr. Demopoulos's cross examination did not prejudice appellants' ability to impeach Dr. Demopoulos, the trial court's ruling standing alone would not require reversal. *See Allemeier v. UW*, 42 Wn. App. 465, 473, 712 P.2d 306 (1985) (nonprejudicial error is no ground for reversal), *review denied,* 105 Wn.2d 1014 (1986).

We next address whether the trial court erred in limiting the scope of appellants' cross examination of Dr. Hammar.

On June 30, 1987, during the course of trial, the court held an in limine hearing on the permissible scope of cross examination of a defense witness, Dr. Samuel Hammar. The defense wanted to call Dr. Hammar as an expert on chrysotile asbestos and its relationship to mesothelioma. He would not be asked to testify regarding Mr. Falk's condition, although he had reviewed Mr. Falk's medical charts and tissue samples. Appellants sought to cross–examine Dr. Hammar on the issue of his opinion as to the diagnosis and cause of Mr. Falk's disease. The court ruled that appellants would not be permitted to cross–examine beyond the scope of Dr. Hammar's direct examination and that as long as the direct examination did not concern the cause or diagnosis of Mr. Falk's disease, appellants could not inquire into his opinion on those issues. There is nothing in the record to

suggest that Dr. Hammar's direct testimony concerned the particulars of Mr. Falk's condition.

■ Appellants argue that their questions of Dr. Hammar regarding his diagnosis of Mr. Falk's disease would impeach his credibility. Decisions regarding the scope of cross examination are left to the sound discretion of the trial court. *Miller v. Peterson,* 42 Wn. App. 822, 827, 714 P.2d 695, *review denied,* 106 Wn.2d 1006 (1986). "Cross examination should be limited to the subject matter of the direct examination . . ." ER 611(b). Here, Dr. Hammar's direct testimony concerned only chrysotile asbestos and its relation to mesothelioma. He did not touch on Mr. Falk's condition or its cause. Appellant argues it was necessary to elicit Dr. Hammar's diagnosis of Mr. Falk to impeach his opinion that chrysotile asbestos does not cause mesothelioma. We disagree.

Dr. Hammar's diagnosis is of dubious impeachment value given that he denies a causal link between chrysotile asbestos and mesothelioma. Mr. Falk's diagnosis was already in the record and available for appellant's use in closing argument. It would not significantly further appellant's cause to elicit the diagnosis again. The trial court did not abuse its discretion by limiting appellants' cross examination to the issue of his direct testimony. *See Johnson v. Mobile Crane Co.,* 1 Wn. App. 642, 649, 463 P.2d 250 (1969).

Finally, appellant raises the issue of whether it was error for the trial court to exclude two of plaintiffs' expert pathologists as witnesses. Although the issue is unlikely to arise on retrial, because of the importance and necessity of the trial court having broad discretion to regulate discovery, especially in complex cases such as this one, we address this issue. Plaintiffs had failed to reveal their intent to call these witnesses until the trial was virtually set to begin. We conclude that the trial court did not err in striking these witnesses. Appellants' only excuse for failing to properly note these witnesses in compliance with the pretrial order, to which no objection or assignment of error has been made and which provided for the exclusion of witnesses as a

sanction for noncompliance, was their attorney's inadvertent mistake. The absence of a reasonable excuse for noncompliance with a discovery order is sufficient to support a finding that the noncompliance was willful. *Taylor v. Cessna Aircraft Co.*, 39 Wn. App. 828, 836, 696 P.2d 28, *review denied,* 103 Wn.2d 1040 (1985). Appellant has failed to assert a reasonable excuse. Therefore, the trial court did not abuse its discretion by excluding the testimony of these pathologists as a sanction for violation of the pretrial order. *Fred Hutchinson Cancer Research Ctr. v. Holman,* 107 Wn.2d 693, 706–07, 732 P.2d 974 (1987).

The judgment of the trial court is reversed and remanded for retrial consistent with the analyses in this opinion.

SCHOLFIELD and WEBSTER, JJ., concur.

Review granted at 112 Wn.2d 1016 (1989).