# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 73069-0-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| THOMASDINH NEWSOME BOWMAN, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: January 23, 2017 |
| | ) | |

VERELLEN, C.J. — Thomasdinh Bowman appeals his conviction for first degree murder. He argues that the State's peremptory challenge of Juror 5, an African-American woman, violated the equal protection clause. We conclude the trial court correctly applied the existing legal standards, and the record supports the finding of no purposeful discrimination.

Bowman also argues his counsel was ineffective for deferring to the client the final decision whether to pursue lesser offenses. But defense counsel conferred with Bowman and agreed with the tactical decision not to pursue lesser offenses.

Bowman's other issues are not compelling. His constitutional challenge to the reasonable doubt instruction has recently been rejected, and the trial court did not abuse its discretion in sustaining the State's objections to Bowman's closing arguments misstating the law and referring to facts not in evidence. However, as required by a recent decision of our Supreme Court, the trial court should have considered his ability to pay before imposing any discretionary legal financial obligations.

Therefore, we affirm Bowman's conviction and remand with instructions for the trial court to conduct an on-the-record inquiry consistent with State v. Blazina.[1]

FACTS

Around 7:30 p.m. on August 31, 2012, witnesses heard five gunshots at the intersection of 15th Avenue N.E. and N.E. 75th Street in Seattle's Roosevelt neighborhood. They heard an engine accelerate and saw a silver BMW Z4 convertible with the top down speed off southbound.

Police responded to reports of multiple gunshots and a male bleeding inside a red Subaru. The male, identified as Yancy Noll, was sitting in a normal position in the driver's seat with his hands on the steering wheel. He had four fatal gunshots to the head. The Subaru's windows were intact, but there was glass in the street on the Subaru's driver's side. Investigators concluded the glass came from the shooter's car window.

A description of the silver BMW, a still image of the car taken from a nearby surveillance video, and a sketch of the suspect BMW driver based on witness descriptions were released to the public. As a result of a tip, police began investigating Thomasdinh Bowman, who had a silver BMW in his driveway less than 10 blocks from the scene of the crime.

On the night of the killing, Bowman turned off his cellphone and purchased a new one that he registered using a false identity, Peter Nguyen. Using that name, Bowman called a BMW store and an auto glass company the following morning to ask about having a window replaced on his 2006 silver BMW Z4. That day, Bowman and his wife

---

[1] 182 Wn.2d 827, 832, 344 P.3d 680 (2015).

drove the BMW to Portland and had the passenger window replaced. Bowman paid the $250 bill in cash.

After the window was replaced, Bowman kept the BMW in his garage. Between September 12 and September 20, 2012, Bowman spray painted the silver BMW wheels black. On September 20, Bowman purchased four tires for his BMW from Big O Tires in Lynnwood, paying in cash. Bowman did not bring the car to the store; he only brought the wheels. The sales manager was surprised the tires were being replaced because they were like new.

Police searched Bowman's workplace and found a slide from a Glock handgun inside a storage container. Forensic experts concluded the cartridge casings found at the scene of the shooting were fired from that particular Glock slide. Bowman's workplace computer contained a collection of documents relating to the investigation of shootings: "Forensic Gunshot Residue Analysis," "Chemical Analysis of Firearms, Ammunition, and Gunshot Residue," "Gunshot Wounds—Practical Aspects of Firearms, Ballistics, and Forensic Techniques," "Advances in Fingerprint Technology," "Automated Fingerprint Identification Systems," "Forensic Interpretation of Glass Evidence," and "Arrest-Proof Yourself." Two more documents found on the computer were guides to committing murder.

The State charged Bowman with first degree murder. At trial, Bowman admitted to shooting Noll in self-defense. He testified that he cut Noll off in traffic; Noll became angry, pursued Bowman, yelled a threat, and threw a water bottle onto Bowman's car as they drove onto the freeway. Bowman claimed he tried to get away from Noll, but Noll pursued him off the freeway and to the intersection where the shooting occurred.

Bowman testified that Noll threw another bottle at his BMW that hit Bowman in the back of the head. Bowman claimed he saw Noll searching for something in the passenger seat, and it was then that Bowman pulled his Glock handgun out of his bag and shot Noll.

Bowman admitted going out to dinner with his wife after killing Noll. Later that night, he disassembled his handgun and disposed of the barrel because he thought it could be used to link the gun to the killing.[2] Bowman claimed he also disposed of the bottles Noll threw at him.

The jury found Bowman guilty as charged. At sentencing, Bowman argued that the trial court should consider as mitigation that he acted in self-defense. The court responded, "The jury rejected it as do I."[3] The court observed that Noll had his hands on the steering wheel when he was shot. It further observed that Bowman's actions after the shooting were inconsistent with a person who had just escaped serious injury by an enraged motorist, specifically going out to dinner and disposing of the only evidence that would support his version of events. The court imposed a sentence within the standard range.

Bowman's appeal primarily concerns the State's peremptory challenge of Juror 5, an African-American woman. The court began jury selection by asking the entire panel of prospective jurors whether they had a friend or close relative accused of a crime, "either rightly or wrongly."[4] Juror 5 responded affirmatively. She said she had a

---

[2] Bowman testified that he kept the slide of the gun because he did not believe it could be used to match ballistic evidence to the gun.

[3] Report of Proceedings (RP) (Jan. 2, 2015) at 42.

[4] RP (Nov. 18, 2014) at 58-59.

50-year-old nephew in California who had been serving time since he was a teenager for murder. Juror 5 also replied that this situation would not impact her ability "to judge this case on its merits."[5]

The court allowed the State and defense counsel two alternating 30-minute rounds of questioning. During its first round, the prosecutor asked Juror 5 her reaction when she heard Bowman's charge. Juror 5 said she did not have a strong reaction. Then the following exchange occurred:

> STATE: Do you believe [your nephew] was rightfully or wrongly accused?
>
> JUROR 5: That's hard because I don't know.
>
> STATE: Okay.
>
> JUROR 5: I don't know that I'll ever know for sure. I know what I'd like to believe, but I don't know for sure.
>
> STATE: From knowledge of that situation, do you have an opinion about how the justice system works?
>
> JUROR 5: Not really. Because we were here in the Northwest and it was—it was in California, so we didn't attend any of the trials, any of that. But hearing from relatives, of course you're going to get their side of it. But what it did for me was that at one time I thought everything was black and white, and then I see that there are gray areas, you know, because there has to be an assurance when you make a decision, you know, there has to be an assurance so you have to look at it.
>
> *So for me, I'm not sure what kind of juror I'd make even* because I want to see, you know, let me see, and then let me experience this and go through the process, because even coming in saying, yeah, that's even like saying—you know, making a decision right there. But, yeah, I had that— that experience. I've talked to that family member and my

---

[5] Id. at 60.

love goes out to him, and, of course, he was quite young. So—*but I don't know.*[6]

Bowman's counsel did not talk to Juror 5 during his first round of questioning. During the State's second round of questioning, the prosecutor asked Juror 5 about her job. Juror 5 said she was in "administrative consulting" and self-employed.[7] She explained, "Just I call it bringing an order out of chaos. . . . The most recent [client] is a person who is very close to me and was in hospice at home, in-home, and just putting everything together for her was a challenge. But it's something I do."[8] The prosecutor then asked about Juror 5's nephew in prison:

STATE: I got the impression, and tell me if this is correct, one of the things you said was "I know what I'd like to believe," *which I assume you'd like to believe that he's innocent.*

JUROR 5: Exactly.

STATE: Okay. But you're not sure?

JUROR 5: One thing, and maybe I should have responded also to your first question, in that one thing that impacted me quite a bit yesterday was to put it in my head about the defendant coming in innocent, not guilty, whichever way you want to phrase it, and in that the reason I raised my hand about process—you know, being a prosecutor is the challenge of maintaining—no, the defendant's attorney maintains his innocence. The onus is on you to provide evidence to—it's hard to put into words, but I understood the challenge.

STATE: Uh huh.

JUROR 5: And *that is what I haven't seen in my nephew's case. I haven't seen enough,* you know, putting aside Forensic Files that I watch or whatever.

---

[6] Id. at 112-13 (emphasis added).

[7] Suppl. RP (Nov. 19, 2014) at 18.

[8] Id.

STATE: Which I have to tell you has nothing to do with what happens in real life.

JUROR 5: I understand that. I understand that.

STATE: So . . .

JUROR 5: But that's what I mean, is that the challenge is to be sure.

STATE: Uh huh.

JUROR 5: And about life experience, this might seem a little asinine, but what comes to my mind is that old commercial, Apple commercial, where this person, this woman comes in with this ball of some sort and just breaks down whatever it is that's been held in, for example, my origin to that I should have an attitude about life, but then there's that -- that moment that comes where it breaks down all of those things. You know, breaks down even traditions sometimes.

So you have to be optimistic about life, be open to whatever it is that comes in front of you. And that's where you have to be unbiased.

STATE: So do you believe that there's a chance that your nephew is in prison unjustly?

JUROR 5: *I don't believe that.* I don't. I don't believe that.[9]

The prosecuting attorney also asked Juror 5 what she meant the prior day when she said, "I'm not sure what kind of juror I'd make":

STATE: Okay. Now, yesterday when [co-counsel] was talking to you about case proof, you said "I'm not sure I'd make a good juror." And the reason was you said "I need to see." Can you expand on that a little bit more?

JUROR 5: What did I say?

STATE: You need to see is what you said. And just I'm not saying specifically that sentence because in context it doesn't make a lot of sense, but were you concerned about your ability to sit? What do you think about having to see things?

---

[9] Id. at 19-21 (emphasis added).

JUROR 5:   Well, maybe it is I have to believe.  So that's why prosecution is so—I mean, the role of a prosecutor is so important because it has to be enough evidence and collective input in order to make a good decision.  *And I'm not sure.*

STATE:   About what?

JUROR 5:   About my ability.  I think I better be honest.

STATE:   Uh huh, please do.

JUROR 5:   Okay.  Because I did think about it last night.  The defense attorney had mentioned that.  And that is because—*I think my nephew is a good example of me not being able to say, well, for sure* because there are times that I say he should be where he is if all of this is right, and then my heart says that's not what I would want for his life or anyone's life.  But then I've been through grief.  So I understand the part of a person who's lost someone.

STATE:   So it would be--it sounds what you're saying, I don't want to put words in your mouth, but *that it would be difficult for you to sit in judgment?*

JUROR 5:   Thank you.

STATE:   To make that—

JUROR 5:   That's correct.[10]

During the defense's second round of questioning, Bowman's counsel addressed

Juror 5 about her reluctance to sit in judgment:

DEFENSE:   [The State] asked you whether you'd feel uncomfortable judging a person, *and you said after some thought yes, right?*

JUROR 5:   *Yes.*

DEFENSE:   Yeah.  There's no—I'm just remembering what you said.  Right?  Is it clear to you, and this is probably the most important question, from my perspective, of course, that you'll hear in this whole process, do you think you are here

---

[10] Id. at 21-22 (emphasis added).

to judge Dinh Bowman, or do you think you're here to judge their case? . . .

JUROR 5:    I think I'm here to judge to the best of my ability the evidence that's presented about the young man and—and to determine whether I feel he did it or if there are extenuating cir—I don't know.  You'd have to put it all together.[11]

During a sidebar conference after the defense's second round of questioning, the State indicated it intended to exercise a peremptory challenge to Juror 5.  Bowman's counsel responded that he needed to think about whether he would raise a Batson v. Kentucky[12] challenge.  At a subsequent sidebar, Bowman's counsel indicated he wanted to make a record as to a Batson challenge, and the court excused the jurors.

Without prompting from the court, the State set forth its reasons for requesting the challenge:

She has a nephew . . . in prison for murder.  She would like to believe that he's innocent.  In which case she believes she has an innocent nephew in prison for murder.

Her statement yesterday was "I'm not sure I would make a good juror."  She said today that she wasn't sure about her ability to follow things and it will be difficult for her to sit in judgment.

She—frankly, we have found it a little hard to track what she was saying in a lot of cases.  Her sentences stopped halfway, but she talked about the old Apple commercial where a woman comes in in a ball and breaks the ball and that seemed to have nothing to do with anything.  She defined herself as being an administrative consultant, but she was not— the way she described that was that she pulls things together and puts a system together, and the example she gave was helping someone who is in hospice. . . . We are not exactly sure what she does.  We have concerns about her ability to track in a whole.

But the two main reasons, Your Honor, are the relationship to someone in her family who is in prison for murder, which is what this crime is, that she would like to believe that he's innocent.  She thinks he

---

[11] Id. at 44-45 (emphasis added).

[12] 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986).

probably isn't, but she would like to believe that. And that means that she believes that there are innocent people in prison for murder in her family.

The second thing is that she would find it difficult to sit in judgment, and in talking to her it was clear, it seemed clear to us that she would be probably unable to reach a verdict at all. Certainly a verdict of guilty because that would be sitting in judgment. And it would be sitting in judgment on someone who is charged with the same thing her nephew is in prison for. I think that's far and away enough to validate the fact that we are not excusing her based on her race in any way, that's the bottom line question, and I would note that there are numerous minorities on this panel.

There are one or two in the box itself. There[] [are] several who are going to be coming up. This has nothing to do with Juror 5's race. I actually think she's a pleasant and intelligent woman, but given her perspective on the world and criminal justice system, we cannot keep her.[13]

Neither defense counsel nor the trial judge disputed the State's observation that there were other potential jurors who were minority members; one or two were in the box already and several were in position to join the panel when peremptory challenges were exercised. Defense counsel's argument was brief. Counsel criticized the State for saying Juror 5 was not intelligent, and the trial court clarified that the State had said she was intelligent. Defense counsel noted the Apple computer commercial Juror 5 referenced "was basically about how your world changes when you learn things."[14] Because Juror 5 "could be only an African-American woman even close to being seated in this case has a relative who is in prison perhaps wrongfully," Bowman's counsel questioned the prosecutor's motive.

_____

[13] Suppl. RP (Nov. 19, 2014) at 66-68.

[14] Id. at 69.

10

The trial court noted the seriousness of excluding jurors based on race:

> [I]t's been particularly disturbing because . . . there's a high percentage of minority people that are charged with crimes and yet predominantly we have nonminorities sitting on juries. So the Court is certainly sensitive to the issue.[15]

The court also noted the distinction between whether the court agrees with the State's doubts about Juror 5 versus whether "the grounds that are being given are a pretext for what is essentially a challenge based on race."[16] The court concluded that "the reasons that have been provided by the State . . . are not racially-based and . . . they're not a pretext for race."[17] It identified as the most important factor Juror 5's statement that

> she would have trouble sitting in judgment of somebody . . . And it seems to me that a completely race neutral reaction to that statement would be this is a person who might have difficulty finding a judgment of guilt against Mr. Bowman regardless of the evidence. That is a legitimate concern.[18]

As to the juror's feelings about her nephew, the court noted Juror 5 "never said that she thought her nephew was innocent. She said she would like to think he's innocent."[19] The court observed that it probably would not be as bothered by that, but "it's not a pretext for racial challenge . . . reasonable people could differ about what inferences they drew from that statement."[20] Juror 5 was excused from the jury panel.

---

[15] Id. at 70.

[16] Id.

[17] Id.

[18] Id. at 70-71.

[19] Id. at 71.

[20] Id.

## ANALYSIS

### I. *Batson* Challenge

Bowman assigns error to the trial court's determination that the State did not engage in purposeful discrimination. Bowman fails to demonstrate reversible error.

We review Batson challenges "for clear error, deferring to the trial court to the extent that its rulings are factual."[21] "Clear error exists when the court is left with a definite and firm conviction that a mistake has been committed."[22]

The United States Supreme Court in Batson established the test to determine whether a juror was peremptorily challenged pursuant to discriminatory criteria. First, the defendant must establish a prima facie case of purposeful discrimination;[23] second, the burden shifts to the State to articulate a race-neutral explanation for challenging the juror;[24] and third, the trial court must decide whether the defendant has demonstrated purposeful discrimination.[25] The ultimate burden of persuasion that there has been purposeful discrimination rests with the defendant.[26]

In State v. Saintcalle, our Supreme Court recognized a need to change the existing Batson procedures in Washington but declined to do so on the briefing before

---

[21] State v. Saintcalle, 178 Wn.2d 34, 41, 309 P.3d 326 (2013); accord State v. Luvene, 127 Wn.2d 690, 699, 903 P.2d 960 (1995); Hernandez v. New York, 500 U.S. 352, 364, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)).

[22] Saintcalle, 178 Wn.2d at 41; accord Ass'n of Rural Residents v. Kitsap County, 141 Wn.2d 185, 196, 4 P.3d 115 (2000).

[23] Batson, 476 U.S. at 93-96.

[24] Id. at 97-98.

[25] Id. at 98.

[26] Rice v. Collins, 546 U.S. 333, 338, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006) (citing id.).

it.[27] The court found that "Batson . . . is failing us" because modern day racism is not overt but rather is embodied in "stereotypes that are ingrained and often unconscious."[28] "Unconscious stereotyping upends the Batson framework," which is "equipped to root out only 'purposeful' discrimination, which many trial courts probably understand to mean conscious discrimination."[29]

Nonetheless, the lead opinion applied Batson, leaving it as the controlling authority we must follow. The lead opinion confirmed the deference a reviewing court must give to the trial court under the existing Batson "purposeful discrimination" standard:

> A trial court's decision that a challenge is race-neutral is a factual determination based in part on the answers provided by the juror, as well as an assessment of the demeanor and credibility of the juror and the attorney. Batson, 476 U.S. at 98 n.21. The defendant carries the burden of proving purposeful discrimination. Id. at 93. The trial judge's findings are "accorded great deference on appeal" and will be upheld unless proved clearly erroneous. Hernandez [v. New York, 500 U.S. 352, 364, 111 S. Ct. 1859, 114 L. Ed. 2d 395 (1991)]. Deference to trial court findings is critically important in Batson cases because the trial court is much better positioned than an appellate court to examine the circumstances surrounding the challenge. Further, deference is important because trial judges must have some assurance that the rest of the trial will not be an exercise in futility if it turns out an appellate court would have ruled on a Batson challenge differently.[30]

Under the existing Batson standard, where the State articulates a race-neutral explanation for its challenge, the trial court is not required to analyze the first step

---

[27] 178 Wn.2d 34, 52-55, 309 P.3d 326 (2013).

[28] Id. at 46.

[29] Id. at 48.

[30] Id. at 55-56.

whether the defendant established a prima facie case of purposeful discrimination.[31]

Here, the State mentioned four grounds for challenging Juror 5: she would not be able to sit in judgment of others; she would like to believe her nephew in prison for murder is innocent and therefore believes he is innocent; it was a "little hard to track what she was saying," noting her reference to the Apple computer commercial; and the State did "not feel like she was being completely forthcoming" about her job.[32] The State believed Juror 5 was "a pleasant and intelligent woman," but was concerned about "her perspective on the world and criminal justice system."[33]

The second step of the process does not demand an explanation that is persuasive or plausible:

> "At this [second] step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral."[34]

Bowman's argument that the State's proffered reasons were pretextual and mere proxies for race concerns the third step, which requires the trial court to consider the State's explanations and determine whether the defendant has demonstrated purposeful discrimination.[35] The State's explanations "must be viewed in the totality of

---

[31] State v. Luvene, 127 Wn.2d 690, 699, 903 P.2d 960 (1995) (citing Hernandez, 500 U.S. at 359).

[32] Suppl. RP (Nov. 19, 2014) at 66-68.

[33] Id. at 68.

[34] Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995) (alteration in original) (quoting Hernandez, 500 U.S. at 360).

[35] Batson, 476 U.S. at 98; see also Reed v. Quarterman, 555 F.3d 364, 368 (5th Cir. 2009); Purkett, 514 U.S. at 768 ("implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination").

the prosecutor's comments."[36] The reviewing court considers the overall circumstances, including any red flags of a discriminatory motive.[37]

If a State's proffered reason for striking a minority panelist applies just as well to an otherwise similar nonminority panelist who is permitted to serve, "that is evidence tending to prove purposeful discrimination to be considered at Batson's third step."[38] Here, however, there is no meaningful record of the makeup of the jury panel or the ultimate jury other than the prosecutor's mention that several members of the panel were minorities, including "one or two in the box itself."[39] Therefore, on this record, it is not possible to conduct any comparability analysis.

Bowman argues the trial court erred by accepting the prosecutor's challenge of Juror 5 based on her inability to sit in judgment of others. He emphasizes that Juror 5 repeatedly said she was capable of being a juror, describing herself as "analytical," not in a "rush," and that she "would be as fair as I know how to be," and that she had no concern over her nephew's conviction.[40]

But Juror 5's exact statements about her ability to sit as a juror provided a race-neutral basis for the State a to exercise a peremptory challenge: "*I'm not sure . . . . [a]bout my ability.* I think I better be honest."[41] Using her nephew as an example,

---

[36] State v. Cook, 175 Wn. App. 36, 43, 312 P.3d 653 (2013).

[37] See id. at 43-44 (prosecutor's peremptory challenge based in part on defense counsel's use of the term "brother" when speaking to an African-American juror and prosecutor's purportedly "confusing" one African-American juror with another "raises a red flag that there is some discriminatory intent").

[38] Miller-El v. Dretke, 545 U.S. 231, 241, 125 S. Ct. 2317, 162 L. Ed. 2d 196 (2005).

[39] Suppl. RP (Nov. 19, 2014) at 68.

[40] Suppl. RP (Nov. 18, 2014) at 115.

[41] Suppl. RP (Nov. 19, 2014) at 21-22 (emphasis added).

Juror 5 noted, "he should be where he is," but on the other hand, "my heart says that's not what I would want for his life or anyone's life."[42] She agreed it would be difficult for her to sit in judgment. Therefore, the record does not support Bowman's argument.

Bowman also argues the State distorted Juror 5's statements about her nephew into a conclusion that she did believe her nephew was innocent. But the trial court clearly recognized that Juror 5 had merely stated she wanted to believe her nephew was innocent.

The State's other concerns relating to the ability to communicate with Juror 5 here do not appear to be race-based. While Juror 5's statements about the Apple commercial ultimately led to a conclusion about the importance of not being biased, the path to that conclusion was meandering. Thus, the State's difficulty in being able to track her responses was not a remark on her intelligence but rather her communication skills. And while the State's concern that Juror 5 was not being forthcoming about her job is perhaps strained, it also suggests the State was concerned about communicating well with Juror 5. We conclude the State's concerns were not on their face racially-motivated observations.

Bowman argues the amount of time spent questioning Juror 5 reveals the State was on a fishing expedition for pretextual reasons to exercise a peremptory challenge. Although <u>Saintcalle</u> recognized that prosecutors cannot go fishing for race-neutral

---

[42] <u>Id.</u> at 22.

reasons for using a peremptory strike and then hide behind the legitimate reasons they do find,[43] that does not mean that merely asking follow up questions is a red flag for purposeful discrimination.

Although implicit bias in jury selection of minority jurors in the criminal setting is problematic, Bowman does not establish that the trial court applied the wrong standard or should not be entitled to deference when analyzing whether the State purposefully discriminated. The trial court had the opportunity to observe the prosecutors' demeanor, and there were no red flags suggesting racial motives as were present in State v. Cook.[44] The record supports the trial court's determination that the reasons offered by the State for exercising a peremptory challenge of Juror 5 were race-neutral.

*II. New Standard*

Bowman alternatively proposes an entirely new limitation on peremptory challenges exercised by the State, to be applied retroactively to his case. Although our Supreme Court in Saintcalle advocated a change to the existing Batson procedures in Washington, it has not made any such change.[45] The lead Saintcalle opinion applied Batson, leaving it as the controlling authority we must follow.[46]

---

[43] Saintcalle, 178 Wn.2d at 43.

[44] 175 Wn. App. 36, 43, 312 P.3d 653.

[45] Efforts are pending to dramatically alter the standard applied to the exercise of peremptory challenges of minority panel members. We note the proposed rule would preclude the type of opening questioning made by the court here. See Proposed adoption of GR 36 cmt. 4(c), Wash. St. Reg. 16-23-014 (Nov. 2, 2016), http://lawfilesext.leg.wa.gov/law/wsr/2016/23/16-23MISC.pdf.

[46] State v. Pedro, 148 Wn. App. 932, 950, 201 P.3d 398 (2009) ("It is error for the Court of Appeals not to follow directly controlling authority by the Supreme Court.").

### III. Lesser Included Offenses

Bowman next argues his counsel was ineffective for deferring to the client the decision whether to pursue lesser offenses. We disagree.

We review ineffective assistance of counsel claims de novo.[47] To prevail, a defendant must show that his counsel's performance fell below an objective standard of reasonableness and that the deficient performance prejudiced his trial.[48]

The decision not to request a lesser included offense instruction is a tactical one. "Although risky, an all or nothing approach was at least conceivably a legitimate strategy to secure an acquittal."[49] Here, Bowman's counsel consulted with Bowman on this issue "many times in depth," advised Bowman the defense could offer the jury lesser included offense options, and acknowledged the decision not to seek lesser included offenses "could be characterized easily as a tactical decision" and "I agree with it."[50]

Defense counsel's approach is appropriate under State v. Grier:

> Even where the risk is enormous and the chance of acquittal is minimal, *it is the defendant's prerogative to take this gamble, provided her attorney believes there is support for the decision. . . .* [A] criminal defendant who genuinely believes she is innocent may prefer to avoid a compromise verdict, even when the odds are stacked against her. Thus, *assuming that defense counsel has consulted with the client in pursuing an all or nothing approach, a court should not second-guess that course of action.*[51]

---

[47] State v. Sutherby, 165 Wn.2d 870, 883, 204 P.3d 916 (2009).

[48] Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); State v. Nichols, 161 Wn.2d 1, 8, 162 P.3d 1122 (2007).

[49] State v. Grier, 171 Wn.2d 17, 42, 246 P.3d 1260 (2011).

[50] RP (Dec. 9, 2014) at 5.

[51] Grier, 171 Wn.2d at 39 (emphasis added).

There is nothing in the record to suggest that defense counsel believed Bowman's decision was unreasonable in this case. And the fact that the strategy proved unsuccessful is irrelevant because "hindsight has no place in an ineffective assistance analysis."[52] Defense counsel's performance here was not deficient.

### IV. Reasonable Doubt Instruction

Bowman claims the jury instruction defining "reasonable doubt" used at his trial is constitutionally defective.[53] But in State v. Lizarraga,[54] State v. Bennett,[55] and State v. Kalebaugh,[56] the use of the instruction has been affirmed. Because controlling authority approves the use of this standard instruction, we reject Bowman's claim.

### V. Objections to Defense Closing Argument

Bowman next claims the trial court erred in sustaining an objection to the defense's closing argument that "*[t]he State has the burden of proving* beyond a reasonable doubt that *the homicide was not justifiable. If you find, and keep in mind this is all subjective,* because you have to view things from Mr. Bowman's standpoint."[57] But

---

[52] Id. at 43.

[53] See 11 WASHINGTON PRACTICE: PATTERN JURY INSTRUCTIONS: CRIMINAL 4.01, at 93 (4th ed. 2016).

[54] 191 Wn. App. 530, 567, 364 P.3d 810 (2015), review denied, 185 Wn.2d 1022 (2016).

[55] 161 Wn.2d 303, 318, 165 P.3d 1241 (2007).

[56] 183 Wn.2d 578, 585-86, 355 P.3d 253 (2015).

[57] RP (Dec. 9, 2014) at 104 (emphasis added).

the justifiable homicide standard is not all subjective.[58] Because the defense's

statement was misleading,[59] we conclude the trial court did not abuse its discretion.

We also conclude the trial court did not abuse its discretion in sustaining an

objection to defense counsel's closing argument about Bowman's books:

> So I'm going to somehow arrange for Mr. Noll to have this road rage incident with me. And then he's going to go on . . . and do what the State believes he did as a student of murder. The thrill kill concept makes no sense in light of the facts. And I don't mean to be condescending because I'm not at all. . . . But if we can—*if you can focus on the facts.* The thrill kill thing makes no sense at all.
>
> If Dinh Bowman was a student of murder because he possessed this manual, and this book, he certainly did not follow the lessons, *all the lessons prescribed in those books.*[60] *Don't do anything in broad daylight. Two, don't do anything in heavy traffic. Three, don't do anything in a flashy car.*[61]

Because the portions of those books admitted into evidence did not include the lessons

defense counsel listed as "prescribed in those books," the defense's argument

improperly relied on information outside the record.[62]

*VI. Discretionary Legal Financial Obligations*

Bowman argues that the trial court imposed $665 in discretionary legal financial

obligations without considering his present or future ability to pay. Based on our

Supreme Court's recent decision in Blazina, which held that "RCW 10.01.160(3)

[58] See State v. Walden, 131 Wn.2d 469, 474, 932 P.2d 1237 (1997) (the defense of justifiable homicide includes both objective and subjective elements).

[59] See State v. Perez-Cervantes, 141 Wn.2d 468, 474, 6 P.3d 1160 (2000) (closing argument by counsel "must be restricted to the facts in evidence and the applicable law, lest the jury be confused or misled").

[60] The "books" defense counsel referenced were the two guides to committing murder found on Bowman's work computer.

[61] RP (Dec. 9, 2014) at 117 (emphasis added).

[62] See Perez-Cervantes, 141 Wn.2d at 474.

requires *the record to reflect* that the sentencing judge made an individualized inquiry into the defendant's current and future ability to pay before the court imposes [legal financial obligations]," we agree.[63] We remand for a hearing limited to this issue.

### VII. Cumulative Error

Finally, Bowman asserts that cumulative error deprived him of a fair trial. But the cumulative error doctrine applies only when there have been several errors that standing alone, may not justify reversal, but in combination, have the effect of denying the defendant a fair trial.[64] Here, because Bowman has not shown several errors, the cumulative error doctrine does not apply.

### VIII. Statement of Additional Grounds

Bowman filed a 41-page single-spaced pro se statement of additional grounds. Many of his challenges are to the sufficiency of the evidence and credibility claims. He ignores that this court reviews a sufficiency challenge viewing the record in the light most favorable to the State and that credibility determinations are for the trier of fact and not subject to review.[65] And when viewed in the light most favorable to the State, there was sufficient evidence to support his conviction.

Bowman raises several challenges to the admissibility of evidence. Bowman ignores that "[d]ecisions involving evidentiary issues lie largely within the sound discretion of the trial court."[66] He also raises several other issues related to the court's

---

[63] 182 Wn.2d 827, 839, 344 P.3d 690 (2015) (emphasis added).

[64] State v. Davis, 175 Wn.2d 287, 345, 290 P.3d 43 (2012).

[65] State v. Green, 94 Wn.2d 216, 221, 616 P.2d 628 (1980); State v. Thomas, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004) (the panel defers "to the trier of fact on issues of conflicting testimony, credibility of witnesses, and the persuasiveness of the evidence").

[66] State v. Nava, 177 Wn. App. 272, 311 P.3d 83 (2013).

discretionary rulings, including impeachment, lack of proper foundation, and relevance. But he fails to establish that any of the challenged rulings were unreasonable or based on untenable grounds.[67]

Bowman makes several prosecutorial misconduct claims. Prosecutorial misconduct allegations are reviewed for an abuse of discretion.[68] Where a defendant fails to object to the challenged conduct, he must show that the conduct was so flagrant and ill-intentioned that a jury instruction could not have cured any resulting prejudice.[69] Bowman fails to make such a showing here.

Finally, Bowman argues ineffective assistance of counsel, but only as a general proposition.[70] He thus fails to inform the court of the nature and occurrence of counsel's alleged errors.[71] Further, he ignores that ineffective assistance claims do not relate to counsel's tactical decisions, and that this court strongly presumes counsel's conduct constituted sound trial strategy.[72] Further, if Bowman "wishes to raise issues on appeal that require evidence or facts not in the existing trial record, the appropriate means of doing so is through a personal restraint petition."[73]

---

[67] See Falk v. Keene Corp., 53 Wn. App. 238, 247, 767 P.2d 576 (1989).

[68] State v. Thorgerson, 172 Wn.2d 438, 460, 258 P.3d 43 (2011).

[69] State v. Russell, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

[70] Statement of Additional Grounds at 4 (arguing that "an [i]neffective [a]ssistance of [c]ounsel claim will be held for all issues of this case as the record should have been protected").

[71] RAP 10.10(c).

[72] Grier, 171 Wn.2d at 33 (quoting State v. Thomas, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987)).

[73] State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).

Accordingly, we affirm and remand to the trial court to make an individualized finding on Bowman's ability to pay the discretionary legal financial obligations.

WE CONCUR:

Trickey, ACJ

Becker, J.